# **EXHIBITS**

Exhibit A                                                                 page 1

Exhibit B                                                                 page 37

Exhibit C                                                                 page 68

Exhibit D                                                                 page 80

Exhibit E                                                                 page 83

Exhibit F                                                                 page 91

Exhibit G                                                                 page 113

Exhibit H                                                                 page 115

EXHIBIT "A"

# EXHIBIT 1



# LIFE AGENT PROFESSIONAL LIABILITY POLICY

*Declarations*

### NOTICE:

THIS IS A CLAIMS-MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST AN INSURED AND REPORTED TO THE INSURER DURING THE POLCY PERIOD (OR REPORTED TO THE INSURER WITHIN 30 DAYS THEREAFTER AS ALLOWED UNDER THE TERMS OF THE POLICY). NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT THAT, THE EXTENDED REPORTING PERIOD APPLIES. DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTION.

PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

| POLICYHOLDER AND ADDRESS | PRODUCER |
|---|---|
| Item 1.(a) The Financial Sales Professionals Purchasing Group 681 S. Parker Street, Suite 300 Orange, CA 92868 | Brown & Brown of California, Inc. dba CalSurance Associates, Inc. 681 S. Parker Street, Suite 300 Orange, CA 92868 |
| 1.(b) Insurance companies represented: Not Applicable | |
| Attn: Nick Deson | Attn: Nick Deson |

| CUSTOMER NUMBER | INSURER |
|---|---|
| 233191 | Columbia Casualty Company |
| **POLICY NUMBER** | |
| 425391280 | |

Item 2. **Broker/Dealer** Represented: Not Applicable

Item 3. **Policy Period**: July 1, 2014 to July 1, 2015
12:01 a.m. local time at the address stated in Item 1.

Item 4. Notice to Insurer:
Claims Notices: Life Agent Intake Notice Administrator
All other notices: CANEWCLAIMS@CNA.COM
or
Life Agent Underwriting Unit
CNA Specialty Claim
PO Box 8317
Chicago, IL 60680-8317

Item 5. Optional Extended Reporting Period:
a. Period: 365 days
b. Premium: 200% of Policy Premium

Item 6. Limits of Liability and Retention:

a. Policy Aggregate Limit of Liability: $50,000,000
b. Vicarious Liability: Included No

GSL40220XX (ED. 06-13)

© CNA All rights reserved.

Exhibit A
Page 3



# LIFE AGENT PROFESSIONAL LIABILITY POLICY

*Declarations*

c. Limits and Retention Schedule

The Limits of Liability set forth below represent the options available to every **Insured** under this Policy, the Limits of Liability applicable to each **Insured** are the Limits of Liability identified in the written records of the **Policyholder**.

| ②<br>SCHEDULED LIMITS OF LIABILITY | ③<br>RETENTIONS |
|---|---|
| **Agents or General Agents** *(who are not also covered as a Registered Representative)*<br>Each **Claim** $1,000,000<br>In the Aggregate $1,000,000 | **Insurance products sponsored by Companies identified in Item 1a. or 1b.:**<br>Each **Claim** $1,000<br><br>**Indexed Annuities:**<br>Each **Claim** $2,000<br><br>All **Outside Business**:<br>Each **Claim** $2,000 |
| **Registered Representatives**<br>Each **Claim** $1,000,000<br>In the Aggregate $1,000,000 | **Mutual Funds/Variable Annuities sold through any Broker/Dealer:**<br>Each **Claim** $2,000 |
| **Agents or General Agents** *(who are not also covered as a Registered Representative)*<br>Each **Claim** $2,000,000<br>In the Aggregate $2,000,000 | **Insurance products sponsored by Companies identified in Item 1a. or 1b.:**<br>Each **Claim** $1,000<br><br>**Indexed Annuities:**<br>Each **Claim** $2,000<br><br>All **Outside Business**:<br>Each **Claim** $2,000 |
| **Registered Representatives**<br>Each **Claim** $2,000,000<br>In the Aggregate $2,000,000 | **Mutual Funds/Variable Annuities sold through any Broker/Dealer:**<br>Each **Claim** $2,000 |
| *(The Limits of Liability shall apply separately to each **Insured** and shall be the maximum Limit of Liability for such **Insured** regardless of whether such **Insured** is duly registered or not.)* | *(The Retention shall apply separately to each **Insured**. If more than one Retention is applicable to a single **Claim**, the maximum aggregate Retention for such **Claim** shall be the largest of such Retentions.)* |

Item 7. Entity **Prior Acts Date**: Not Applicable

Item 8. Endorsements forming a part of this Policy at issuance:

Endorsement No: 1 GSL37726XX (5-14) Exclude Specific Individuals
Endorsement No: 2 GSL4019XX (8-06) Service of Suit
Endorsement No: 3 CNA78911XX (5-14) Tie in Limits Endorsement
Endorsement No: 4 GSL40221NY (6-13) New York Amendatory Endorsement

These Declarations, along with the completed and signed Application, the Policy, and any written endorsements attached thereto shall constitute the contract between the Insureds and the Insurer.

GSL40220XX (ED. 06-13)

© CNA  All rights reserved.

Exhibit A
Page 4



# LIFE AGENT PROFESSIONAL LIABILITY POLICY

*Declarations*

Authorized Representative:

Date: June 4, 2014

GSL40220XX (ED. 06-13)

© CNA All rights reserved.

Exhibit A
Page 5



### THE FINANCIAL SALES PROFESSIONALS PURCHASING GROUP
### LIFE AGENT PROFESSIONAL LIABILITY POLICY

### NOTICE:

**THIS IS A CLAIMS-MADE AND REPORTED POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST AN INSURED AND REPORTED TO THE INSURER DURING THE POLICY PERIOD (OR REPORTED TO THE INSURER WITHIN 30 DAYS THEREAFTER AS ALLOWED UNDER THE TERMS OF THE POLICY). NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT THAT, THE EXTENDED REPORTING PERIOD APPLIES. DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTION.**

**PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

The Insurer and the **Insured** agree as follows, in consideration of the payment of the premium and in reliance upon all statements made in the **Application**.

## I.   INSURING AGREEMENTS

### A.   PROFESSIONAL LIABILITY

Subject always to paragraph C. below, How this Coverage Applies, the Insurer shall pay on behalf of the **Insureds** that **Loss** which the **Insureds** become legally obligated to pay resulting from a **Claim** for a **Wrongful Act** solely in rendering or failing to render **Professional Services**.

### B.   VICARIOUS LIABILITY

If purchased, and subject always to paragraph C. below, How this Coverage Applies, if the entity (other than a **Broker-Dealer**) named in Item 1.a. or b. of the Declarations is named as a co-defendant with an **Agent or General Agent** in a **Claim** otherwise covered under Insuring Agreement A. above, the Insurer shall pay on behalf of such entity that **Loss** which such entity becomes legally obligated to pay resulting from a **Claim** for a **Wrongful Act** by an **Agent or General Agent** provided that such **Claim** contains no allegations of negligence or bad faith against such entity, whether such allegations involve negligent hiring, training, management, supervision or otherwise.

### C.   HOW THIS COVERAGE APPLIES

Coverage for a **Claim** for a **Wrongful Act** as specified under paragraphs A. or B. above applies only if:

1.   the **Wrongful Act** giving rise to such **Claim**:
    i.   occurred on or after the **Prior Acts Date** and prior to the end of the **Policy Period**; or
    ii.  with respect to any **Agent or General Agent** or **Registered Representative** such **Wrongful Act** occurred on or after the **Prior Acts Date** and while their enrollment was on file with the **Policyholder** or **Broker/Dealer** named on the Declarations.
2.   the **Claim** is first made against any **Insured** during the **Policy Period**, or any Extended Reporting Period, if applicable, and reported to the Insurer in accordance with Section VII, NOTICE; and

© CNA  All rights reserved.

Exhibit A
Page 6



3.  prior to the date of the **Insured's** initial enrollment under this Policy, or under any other policy issued by the Insurer (or its affiliated insurers) of which this Policy is a renewal (whether successive or not) or replacement, whichever is earlier, no **Insured** knew of, or could have reasonably foreseen that any such **Wrongful Act** could result in a **Claim**; and

4.  no **Insured** gave notice under any Prior Policy of any such **Wrongful Act** or any **Interrelated Wrongful Acts**.

## II.  DEFENSE

### A.  Defense of **Claims**

If a **Claim** is made against the **Insured** within the United States of America, its territories or possessions or Canada, the Insurer shall have the right and duty to defend such **Claim**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Insurer may make such investigation and negotiate settlement of any **Claim** it deems expedient, but the Insurer shall not be obligated to pay any **Loss** to defend or continue to defend any **Claim** after the applicable limit of the Insurer's liability has been exhausted by payment of **Loss**.

### B.  Insurer's Consent

The **Insured** shall not admit liability, consent to any judgment, agree to any settlement, make any settlement offer, assume any obligation or incur any default judgment or award without the Insurer's prior consent, which consent shall not be unreasonably withheld. The Insurer shall not be liable for any **Loss** incurred by the **Insured** to the extent the **Loss** results from such **Insured** admitting liability, consenting to any judgment, agreeing to any settlement, making any settlement offer or incurring expenses without the Insurer's prior consent. The **Insureds** agree that they shall not knowingly take any action which increases the Insurer's exposure for **Loss** under this Policy resulting from any **Claim**.

### C.  Arbitration

The **Insured** shall not demand or agree to arbitration of any **Claim** made against the **Insured** without the written consent of the Insurer, except with respect to arbitration between an **Insured** and a **Client**. In the event any **Claim** is submitted to arbitration, the Insurer, as soon as practicable, shall notify the **Insured** of the date of the arbitration hearing. The Insurer shall be entitled to exercise all of the **Insureds'** rights in the choice of arbitrators and in the conduct of any arbitration proceeding involving a **Claim** covered by this Policy.

## III.  DEFINITIONS

Wherever appearing in bold print in this Policy:

**Accredited Investor** shall mean the most recent definition provided by the Securities and Exchange Commission at the time the **Wrongful Act** giving rise to a **Claim** occurred.

**Administration of Employee Benefit Plans** means consultation with participants in an employee benefit plan in order to explain the provisions of such plan and handling day-to-day ministerial functions required by such plan, including without limitation enrollment, record keeping and filing reports with government agencies. **Administration of Employee Benefit Plans** does not include third party claims administration.

© CNA  All rights reserved.



**Agent or General Agent**, whether used separately or together, means a natural person:

A.   who was contracted with Lincoln Benefit Life Insurance Company; and

B.   who had elected to enroll for coverage under the Lincoln Benefit Life Insurance Company policy, policy number 425391280, during the 2013-2014 **Policy Period**;

C.   who has elected to enroll for coverage under this Policy and whose enrollment is on file with the **Policyholder**; and

D.   who meets all of the **Eligibility Criteria**.

**Agent or General Agent** also includes:

i.   any corporation, partnership, or other business entity owned or controlled by such natural person referred to in A., B., C. and D. of this definition, but solely with respect to the liability of such entity as it arises out of the rendering of or failing to render **Professional Services** by an **Insured Agent or General Agent**, as defined in A., B., C. and D. of this definition;

ii.   any natural person who is a life insurance producer for any insurance company provided such natural person also qualifies under paragraph A., B., C. and D. of this definition or qualifies for coverage as a **Registered Representative** under this Policy; or

iii.   those individuals that have been approved for the Just In Time Contracting Process.

**Application** means all signed applications for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer or any affiliate of the Insurer of which this Policy is a renewal or replacement. An "affiliate of the Insurer" means an insurer controlling, controlled by or under common control with the Insurer.

**Broker/Dealer** means any securities broker or dealer as those terms are defined in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, as amended.

**Claim** means:

A.   a written demand for monetary damages; or

B.   a civil adjudicatory or arbitration proceeding for monetary damages,

against an **Insured** for a **Wrongful Act**, including any appeal thereof, brought by or on behalf of or for the benefit of any **Client**.

**Client** means a natural person to whom, or entity to which, **Professional Services** are rendered by an **Insured**. **Client** does not include any Insurance Company, Insurance Agent or **Broker/Dealer**.

**Defense Costs** means reasonable and necessary fees and expenses incurred by or at the direction of the Insurer in defense of any **Claim**, and costs of appeal, attachment or similar bonds. The Insurer has no obligation to provide such bonds. **Defense Costs** shall not include salaries, wages,

Exhibit A
Page 8



fees, overhead or benefit expenses associated with the directors, officers and employees of the **Insured**, or fees and expenses of independent adjusters.

**Domestic Partner** means any person qualifying as such under any federal, state or local laws or under any **Insured** entity's employee benefit plans.

**Eligibility Criteria** means the requirements set forth below that each **Agent**, **General Agent** or **Registered Representative** must have satisfied in order to be an **Insured** under this Policy:

a.    In the last five years either:

    i.    no **Claims** were made against such **Agent**, **General Agent** or **Registered Representative**; or

    ii.    in the event a **Claim** was made against such **Agent**, **General Agent** or **Registered Representative**, the total amount paid by the Insurer on behalf of such **Agent, General Agent or Registered Representative** was less than $50,000.

b.    No regulatory or administrative fines, penalties, hearings or complaints or disciplinary or criminal actions were made or brought against such **Agent, General Agent or Registered Representative** including those brought by a self-governing regulatory authority.

**Insured** means:

A.    Under Insuring Agreement A:

    1.    an **Agent or General Agent**;

    2.    a **Registered Representative** of any **Broker/Dealer** but solely for those **Professional Services** defined under paragraph B. of the definition of **Professional Services**; or

    3.    a natural person who is a former or current secretarial, clerical or administrative employee of the **Agent, General Agent**, or **Registered Representative** listed in paragraphs 1. and 2. above but solely for services performed within their capacity as such and on behalf of such **Agent, General Agent** or **Registered Representative** provided such natural person did not receive any commission income pursuant to an agent, broker or registered representative contract with any insurance company or broker/dealer as a result of providing **Professional Services** offered by the **Agent, General Agent**, or **Registered Representative**.

B.    Under Insuring Agreement B., the **Policyholder** referenced in Item 1a. or 1b. of the Declarations.

**Interrelated Wrongful Acts** means any **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event.

**Loss** means monetary settlements or monetary judgments (including any award of pre-judgment and post-judgment interest) and **Defense Costs** for which the **Insured** is legally obligated to pay on account of a covered **Claim**.

However, **Loss** shall not include:

A.    criminal or civil fines or penalties imposed by law or taxes. However, **Loss** shall include any taxes, fines, and penalties incurred by a third party and included in such third party's **Claims** against the **Insured**;

© CNA  All rights reserved.



B.      any amounts for which there is no legal recourse against the **Insureds**;

C.      punitive or exemplary damages or the amount of any multiplied damage award which is in excess of the damage award so multiplied;

D.      costs incurred as a result of any injunctive relief;

E.      the return of commissions, fees or charges for services rendered by an **Insured**; or

F.      matters which are uninsurable under the law pursuant to which this Policy shall be construed.

**Madoff Claim** means a **Claim** based upon, arising out of, or in any way involving, the placement of a **Client's** funds in any hedge fund, fund of funds, mutual fund, variable annuity, indexed fund, feeder fund, other investment vehicle or investment account which invested with, placed funds with, or transferred funds to Bernard L. Madoff or Bernard L. Madoff Investment Securities.

**Outside Business** means products placed by an **Insured** with any insurance company not specified in Item 1a. or 1b. of the Declarations.

**Personal Injury** means injury or damage sustained by any person or organization caused by or arising out of:

A.      false arrest, detention or imprisonment, or malicious prosecution;

B.      libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; or

C.      wrongful entry or eviction, or other invasion of the right of private occupancy.

**Policy Period** means the period from the effective date of this Policy to the Policy expiration date specified in Item 3. of the Declarations, or its earlier cancellation date.

**Policyholder** means the natural person or organization specified in Item 1a. of the Declarations.

**Pollutants** mean any substance exhibiting hazardous characteristics as or may be defined or identified on any list of hazardous substances issued by the United States Environmental Protection Agency or any state or local or foreign counterpart. **Pollutants** also means, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste (including materials to be recycled, reconditioned or reclaimed), as well as any air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos, or asbestos products or any noise.

**Prior Acts Date** means with respect to an **Agent, General Agent** or **Registered Representative** the date the **Agent, General Agent** or **Registered Representative** became continuously insured without interruption under any claims made professional liability policy (subject to written proof of such coverage at the time the **Insured** gives written notice to the Insurer of a **Claim** under this Policy).

**Professional Services** means:

A.      with respect to a natural person **Agent or General Agent**, to the extent they are provided in the course and scope of the **Insured's** business as an **Agent or General Agent** and such

© CNA  All rights reserved.



**Agent** or **General Agent** has the appropriate license in both the **Client's** resident state or jurisdiction and the state or jurisdiction in which the business is conducted:

1. the sale, attempted sale or servicing of life insurance, accident and health insurance, managed health care organization contracts, disability income insurance, fixed annuities, and 24 hour care coverage (as defined by statutory law);

2. the sale, attempted sale or servicing of employee benefit plans, individual retirement plans and KEOGH retirement plans;

3. **Administration of Employee Benefit Plans**;

4. financial planning activities in conjunction with services described in paragraphs 1. through 3. of this definition, whether or not a separate fee is charged;

5. the supervision, management and training of an **Agent** by a **General Agent** with respect to activities otherwise covered by this Policy; or

6. services as a notary public.

B. with respect to **Registered Representative** and only to the extent **Professional Services** are provided in the course and scope of the **Insured's** business as a **Registered Representative** and such **Registered Representative** has the appropriate license in both the **Client's** resident state or jurisdiction and the state or jurisdiction in which the business is conducted:

1. the sale, attempted sale or servicing of variable annuities, variable life insurance and mutual funds that are registered with the Securities Exchange Commission, if required, through a **Broker/Dealer** that is a member of the Financial Industry Regulatory Authority;

2. financial planning activities in conjunction with services described in paragraphs 1. through 3. of this definition, whether or not a separate fee is charged;

3. Services performed as a Fiduciary Adviser as defined in the Pension Protection Act of 2006, and any amendment thereof; or

4. the supervision, management and training of a **Registered Representative** by a registered principal who is also an **Insured** under this Policy with respect to activities otherwise covered by this Policy.

**Registered Representative** means:

A. 1. a natural person who is registered with the Financial Industry Regulatory Authority as a registered representative or registered principal, who maintains a contract with a **Broker/Dealer**, who has elected to enroll for coverage under this Policy, who was enrolled for coverage under the Lincoln Benefit Life Insurance Company, policy number 425391280, during the 2013-2014 **Policy Period** and whose enrollment is on file with the **Policyholder**; or

2. any corporation, partnership or other business entity that is owned or controlled by such natural person, but solely with respect to the liability of such organization arising out of failing to render **Professional Services** by an **Insured**;

and

© CNA  All rights reserved.



B.    who meets all of the **Eligibility Criteria**.

**Retired or Disabled**, whether used either separately or together, means:

A.    retired or disabled in conformance with the written practices and procedures of the **Policyholder or Broker/Dealer** which are in effect at the inception of the **Policy Period**; and

B.    no longer providing **Professional Services** on behalf of the **Broker/Dealer** or any other insurance company or broker/dealer.

**Retired or Disabled Agents, General Agents** or **Registered Representatives**, whether used either separately or together, means **Agents, General Agents** or **Registered Representatives** who are **Retired or Disabled**.

**Wrongful Act** means any negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**.

## IV.    EXTENDED REPORTING PERIOD

A.    If the **Policyholder** cancels or non-renews this Policy, or if the Insurer non-renews this Policy, other than for nonpayment of Premium, the **Policyholder** shall have the right to purchase, upon payment of an additional premium determined as described in Item 5b. of the Declarations, an extension of this Policy for the period described in Item 5a. of the Declarations immediately following the end of the **Policy Period**, but only with respect to any covered **Claims** made against the **Policyholder** during such extension arising out of a **Wrongful Act** committed after the **Prior Acts Date** but before the end of the **Policy Period**. This period shall be referred to as the Policyholder Optional Extended Reporting Period.

B.    As a condition precedent to the right to purchase the Policyholder Optional Extended Reporting Period, the total premium for this Policy must have been paid. The right to purchase the Policyholder Optional Extended Reporting Period shall end unless the Insurer receives written notice and full payment of the premium for such period within 10 days after the end of the **Policy Period**.

C.    An **Agent or General Agent** or **Registered Representative** shall not be entitled to any Extended Reporting Period, if the **Policyholder** or the **Broker/Dealer** terminated its relationship with such **Agent or General Agent** or **Registered Representative** for disciplinary reasons in conformance with the **Policyholder's** or the **Broker/Dealer's** written practices and procedures in effect at the time of the termination of the relationship.

D.    If the Policyholder Optional Extended Reporting Period is purchased, the entire premium shall be deemed earned at its commencement without any obligation by the Insurer to return any portion thereof.

E.    If the **Policyholder** cancels or non-renews this Policy, or if the Insurer non-renews this Policy, other than for nonpayment of Premium, each **Agent or General Agent** or **Registered Representative** shall be entitled to a ninety (90) day extension of this Policy ("Automatic Extended Reporting Period") at no charge but only with respect to a **Claim** made during such Automatic Extended Reporting Period arising out of a **Wrongful Act** committed after the applicable **Prior Acts Date** but before the end of the **Policy Period**.

F.    In the event that an **Agent or General Agent** or **Registered Representative** ceases their status as such with the **Policyholder**, such **Agent or General Agent** or **Registered Representative** shall be entitled to an extension of this Policy for whichever comes first:

GSL40219XX ED. (05-14)

© CNA  All rights reserved.

Exhibit A
Page 12



i.      ninety (90) days;

ii.     the expiration of the **Policy Period**,

at no additional charge ("Automatic Extended Reporting Period") but only with respect to a **Claim** made during such Automatic Extended Reporting Period arising out of a **Wrongful Act** committed after the applicable **Prior Acts Date** and committed before his or her termination date.

G.      In the event that an **Agent or General Agent** or **Registered Representative** or becomes **Disabled** during the **Policy Period**, such **Retired** or **Disabled Agent or General Agent**, or **Registered Representative** shall be entitled to an unlimited duration automatic extension of this Policy  at no additional charge ("Automatic Extended Reporting Period") but only with respect to a **Claim** made during such Automatic Extended Reporting Period arising out of a **Wrongful Act** committed after the applicable **Prior Acts Date** but before the date that he or she **Retired** or became **Disabled**.   Provided always that such Automatic Extended Reporting Period shall cease if at a later date such **Retired** or **Disabled Agent**, **General Agent**, or **Registered Representative** enrolls in any broker, dealer, life agent, registered representative, registered investment adviser, financial planning or professional liability policy, other than this Policy, whether or not that policy actually affords coverage for the **Claim** in question.

## V.      ESTATES, LEGAL REPRESENTATIVES AND SPOUSES

The estates, heirs, legal representatives, assigns spouses or **Domestic Partners** of **Insureds**, under Insuring Agreement A., shall be considered **Insureds** under this Policy; provided however, that coverage is afforded to such estates, heirs, legal representatives, assigns, spouses or **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly-held property or property transferred from the **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign spouse or **Domestic Partner**.  All terms and conditions of this Policy, including without limitation the retention applicable to **Loss** incurred by the **Insured** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses or **Domestic Partners**.

## VI.     LIMIT OF LIABILITY, RETENTION AND ALLOCATION

A.      Policy Aggregate:

The amount set forth as the Policy Aggregate Limit of Liability in Item 6a. of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer for all **Loss** under this Policy, regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**.  The Scheduled Limits of Liability set forth in Item 6c. of the Declarations are sub-limits which further limit and do not increase the Insurer's limit of liability under this Policy Aggregate Limit.

B.      Professional Liability Insuring Agreement A.

Subject always to Section VI. paragraph A., Policy Aggregate, if a Limit of Liability is set forth in the Declarations at column ⑦ of Item 6c. for the applicable **Insured** under the

© CNA  All rights reserved.



Professional Liability Insuring Agreement A., such Scheduled Limit of Liability shall apply separately to each applicable **Insured** covered under such Insuring Agreement as follows:

1.    Each **Claim**

Subject to paragraph 2. below, the Limit of Liability of the Insurer for **Loss** for each **Claim** first made against an **Insured** and reported to the Insurer during the **Policy Period** shall not exceed the amount stated in the Declarations for each **Claim**.

2.    Aggregate

The Limit of Liability of the Insurer for **Loss** for all **Claims** first made against an **Insured** and reported to the Insurer during the **Policy Period** shall not exceed the amount stated in the Declarations for all **Claims** in the Aggregate.

If the Scheduled Limits of Liability for Insuring Agreement A., as set forth in the Declarations at column ② of Item 6c. include more than one option, only one Limit of Liability option shall be available to each **Insured** and such option shall be the option identified in the written records of the **Policyholder**, subject to the maximum aggregate Limit of Liability of the Insurer as set for in this Section VI.

C.    Vicarious Liability - Insuring Agreement B. (where included)

If Insuring Agreement B. is included, no additional Limit of Liability is afforded under Insuring Agreement B.  Rather, subject always to Section VI. paragraph A., Policy Aggregate, the Limit of Liability applicable to **Claims** under Insuring Agreement A. shall be the Limit of Liability under Insuring Agreement A. applicable to the **Agent or General Agent** named as a co-defendant with the **Insured** entity under Insuring Agreement B.

D.    Multiple **Insureds**

Subject always to Section VI. paragraph A., Policy Aggregate, each **Insured's** applicable Limits of Liability, as set forth above, shall be the Insurer's maximum Limit of Liability for such **Insured**.  Further, where two or more **Insureds** are involved in a **Claim**, the maximum aggregate Limit of Liability of the Insurer for all such **Insureds** shall be the largest single Limit of Liability applicable to any one of such **Insureds**.

E.    Exhaustion of Limit of Liability

The Insurer's obligations under this Policy shall be deemed completely fulfilled and extinguished if the applicable Limit of Liability is exhausted by payment of **Loss**.

F.    Retention

Subject to the applicable Limit of Liability, the Insurer shall pay all covered **Loss** excess of the applicable Retention, if any, set forth in Column ③ Item 6c. of the Declarations.  The scheduled Retentions shall apply separately to each **Insured** as follows:

A single and separate Retention shall apply to all **Loss** resulting from each **Claim**.  If more than one Retention is applicable to a single **Claim**, the maximum aggregate Retention for such **Claim** shall be the largest of such Retentions.

If the Insurer, in the exercise of its discretion and without any obligation to do so, pays any amount within the amount of the applicable Retention, the **Insured** shall be liable to the

© CNA  All rights reserved.



Insurer for any and all such amounts and, upon demand, shall pay such amounts to the Insurer.

G. **Interrelated Wrongful Acts**

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed to have been made on the earlier of:

A. the date on which the earliest such **Claim** was first made; or

B. the first date valid notice was given by an **Insured** and received by the Insurer under this Policy of any **Wrongful Act** or under any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event or transaction which underlies any such **Claim**.

H. Allocation

If a **Claim** made against the **Insureds** includes both covered and uncovered matters or if a **Claim** is made against **Insureds** who are extended coverage under this Policy and others who are not extended coverage therefor under this Policy, the **Insureds** agree that there must be an allocation between insured and uninsured **Loss** (other than that part of **Loss** attributable to **Defense Costs**). The **Insureds** and the Insurer shall exert their best efforts to agree upon a fair and proper allocation between such insured and uninsured **Loss** based upon the relative legal exposures of the parties to such matters.

VII. **NOTICE**

A. If a **Claim** is made against any **Insured**, the **Insured** shall, as soon as practicable, notify the Insurer during the **Policy Period** and forward to the Insurer every demand, notice, summons, or other process received. Notwithstanding the requirement that the **Claim** must be first made and reported to the Insurer during the **Policy Period**, if continuous coverage is in effect pursuant to consecutive policies issued by the Insurer, a **Claim** may be first made against the **Insured** during one **Policy Period** and may be reported to the Insurer in writing during the consecutive, immediately following, **Policy Period** without constituting a violation of this provision. The **Policy Period** in effect on the date the **Claim** is reported to the Insurer shall apply.

In addition, notwithstanding the requirement that the **Claim** must be first made against the **Insured** and reported to the Insurer during the **Policy Period**, the **Policyholder** shall have an extension of this Policy for a period of 30 days immediately following the end of the **Policy Period**, but only with respect to providing notice to the insurer of a **Claim** first made against any **Insured** during the **Policy Period** and prior to the date of termination of the Policy.

In no event, however, shall the Insurer be responsible to pay any **Loss** in connection with any default judgment entered against an **Insured** prior to notice to the Insurer or as a result of untimely notice to the Insurer nor shall the Insurer be responsible to pay any **Loss** in connection with any **Claim** in which the Insurer's interests have been prejudiced because of the **Insured's** failure to supply timely notice to the Insurer.

B. If, during the **Policy Period** the **Insureds** first become aware of specific **Wrongful Acts** which may reasonably give rise to a future **Claim** and during such period give written notice to the Insurer of:

Page 10
© CNA All rights reserved.



1.  the names of the potential claimants and a description of the specific **Wrongful Act** which forms the basis of their potential **Claim**;
2.  the identity of the specific **Insureds** allegedly responsible for such specific **Wrongful Act**;
3.  the consequences which have resulted or may result from such specific **Wrongful Act**;
4.  the nature of the potential monetary damages or non-monetary relief which may be sought in consequence of such specific **Wrongful Act**; and
5.  the circumstances by which the **Insureds** first became aware of such specific **Wrongful Act**,

then any **Claim** otherwise covered under this Policy which is subsequently made against the **Insureds** and which arises out of such **Wrongful Act** shall be deemed to have been first made at the time such written notice was received by the Insurer. No coverage is provided for a **Claim** resulting from such **Wrongful Act** until such time as such **Claim** is reported to the Insurer in accordance with paragraph A. above.

C.  Except as provided in paragraph B. above, a **Claim** shall be deemed to be made

A.  in the case of a civil proceeding or arbitration, on the earliest of the date of service upon or other receipt by any **Insured** of a complaint or similar document against the **Insured** in such proceeding or arbitration; or
B.  in the case of a written demand for monetary damages, on the **Insured's** receipt of notice of such demand.

D.  The **Insureds** shall give written notice to the Insurer under this Policy as specified in Item 4. of the Declarations, which shall be effective upon receipt.

E.  The **Insureds** shall furnish the Insurer with copies of reports, investigations, pleadings, and all related papers and such other information, assistance and cooperation as the Insurer may reasonably request. The **Insureds** agree to cooperate with the Insurer, and provide all assistance and information reasonably requested by the Insurer. When requested by the Insurer, the **Insureds** shall submit to examination by a representative of the Insurer, under oath if required, and shall attend hearings, depositions, and trials and shall assist in the conduct of **Claims** including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the Insurer's representatives and meeting with such representatives for the purpose of investigation or defense, all of the above without charge to the Insurer.

## VIII.  CANCELLATION

A.  The Insurer may not cancel this Policy except for non-payment of any premium when due, by providing to the **Policyholder** written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. Failure to pay the initial policy premium within 30 days of inception of this Policy will be deemed a rejection of our offer to insure, and no coverage under this Policy shall be effective.

B.  The **Insureds** grant the exclusive authority to cancel this Policy to the **Policyholder**. This Policy may be canceled by the **Policyholder** by surrender of this Policy to the Insurer or by giving written notice to the Insurer stating when thereafter such cancellation shall be effective. The making of such notice by registered, certified or other first class mail, to the Insurer at the address shown in the Declarations, shall be sufficient proof of notice and this Policy shall terminate at the date and hour specified in such notice.

© CNA  All rights reserved.



C.  If the **Policyholder** cancels, earned premium will be computed in accordance with the customary short rate table and procedures. If the Insurer cancels, earned premium shall be computed pro-rata.

## IX.  OTHER INSURANCE

If any **Loss** resulting from any **Claim** is insured under any other policies, this Policy shall apply only to the extent the **Loss** exceeds the Limit of Liability under such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy.

## X.  PREMIUM

A.  The **Policyholder** agrees to provide the Insurer with any documentation and information that the Insurer may reasonably request during the **Policy Period** in order that the Insurer may determine the number of **Agents, General Agents** or **Registered Representatives** or with the **Policyholder**.

B.  **PREMIUM FOR THIS POLICY IS THE OBLIGATION OF, AND IS PAID TO, THE INSURER BY THE POLICYHOLDER. THE INSURER DOES NOT COLLECT FROM, AND WILL NOT RETURN, ANY PREMIUM TO ANY INSURED OTHER THAN THE POLICYHOLDER.**

## XI.  CHANGE OF STATUS OF POLICYHOLDER OR BROKER/DEALER

A.  Takeover of first named **Policyholder**

In the event that, during the **Policy Period**, the **Policyholder** specified in Item 1a. of the Declarations shall consolidate with or merge into, or shall sell substantially all of its assets to, any other person or entity or group of persons or entities acting in concert, or if any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of such corporation, this Policy shall continue until it is otherwise terminated, but only with respect to **Claims** for **Wrongful Acts** occurring before the effective date of such consolidation, merger, sale or acquisition.

B.  Cessation or Takeover of Subsidiaries or Affiliates

If any entity named in Item 1b. or Item 2. of the Declarations ceases to be a subsidiary or affiliate of the first named **Policyholder** there shall be no coverage afforded to such subsidiary or affiliate or its **Agents, General Agents** or **Registered Representatives** under the this Policy for any **Wrongful Act** by such **Agents, General Agents** or **Registered Representatives** occurring after the date such organization ceased to be a subsidiary or affiliate.

## XII.  COVERAGE WITH RESPECT TO NEW ACQUISITIONS

A.  If Insuring Agreement B. of this Policy is purchased, and if, on or after the inception date of this Policy, the **Policyholder** specified in Item 1a. of the Declarations acquires voting stock of another life insurer representing more than 50% of the voting power for the election of the board of directors of such life insurer, or acquires all or substantially all of the assets of another life insurer, any of the foregoing being an "acquisition," coverage for such newly acquired **Policyholder** under of this Policy shall be provided as follows:

© CNA All rights reserved.



1.  If such acquisition will result in an increase of the consolidated sales force or consolidated gross assets of the **Policyholder** named in Item 1a. by less than 10%, coverage under Insuring Agreement B. shall be automatically extended (subject to all other terms and conditions of this Policy) to include **Claims** made against such newly acquired **Policyholder** for any **Wrongful Acts** of an **Agent or General Agent** or **Registered Representative** occurring subsequent to the date of acquisition, but only for a period of 30 days from the date of acquisition, or until the termination of the **Policy Period**, whichever is earlier. No coverage shall be afforded by this Policy to any **Insured** with respect to activities or liabilities of such newly acquired life insurer occurring or incurred prior to the acquisition, unless and until an endorsement to this Policy, or written confirmation, is issued/received by the Insurer expressly granting such coverage. Issuance of any such endorsement shall be at the Insurer's absolute discretion. No coverage shall be afforded after the period of 30 days unless an endorsement to this Policy is issued by the Insurer expressly granting such coverage.

2.  If such acquisition will result in an increase of the consolidated sales force or consolidated gross assets of the **Policyholder** named in Item 1a. by 10% or more, no coverage under Insuring Agreement B. shall be afforded to such newly acquired life insurer unless and until an endorsement to this Policy, or written confirmation, is issued/received by the Insurer expressly granting such coverage.

B.  If, on or after the inception date of this Policy, a corporation specified in Item 1. or 2. of the Declarations acquires voting stock or assets of another entity resulting in an increase of the consolidated sales force by 10% or more, no coverage shall be afforded to those **Agents, General Agents** or **Registered Representatives**, that were previously associated with the other entity, unless an endorsement to this Policy is issued or written confirmation is issued/received by the Insurer expressly granting such coverage.

## XIII. SUBROGATION AND RECOVERY

In the event of any payment under this Policy, the Insurer shall be subrogated to all the **Insured's** rights of recovery therefore against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing to prejudice such rights. Any amount recovered in excess of the Insurer's total payment shall be restored to the **Insured**, less the cost to the Insurer of recovery.

## XIV. CHANGES

Notice to any agent or knowledge possessed by an agent or by any other person shall not affect a waiver or a change in any part of this Policy, or stop the Insurer from asserting any right under the provisions of this Policy. The provisions of this Policy shall not be waived, changed or modified except by endorsement issued to form a part of this Policy.

## XV. NO ACTION AGAINST INSURER

No action shall be taken against the Insurer unless, as a condition precedent thereto, the **Insured** shall have fully complied with all terms of this Policy, or until the amount of the **Policyholder's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. Nothing contained in this Policy shall give any person or organization any

© CNA All rights reserved.



right to join the Insurer in any action against the **Insured** to determine the **Insured's** liability, nor shall the Insurer be impleaded by the **Insured** or their legal representative in any such **Claim**.

## XVI. ASSIGNMENT OF INTEREST

Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed to this Policy.

## XVII. TERRITORY

This Policy applies to **Wrongful Acts** which happen anywhere in the world, but only with respect to **Claims** made or suits brought against the **Insured** in the United States of America, its territories or possessions, or Canada.

## XVIII. ENTIRE AGREEMENT

The **Policyholder** agrees that this Policy, including the **Application**, any materials submitted or required to be submitted therewith, and any written endorsements attached, constitute the entire contract existing between **Insureds** and the Insurer or any of its agents relating to this insurance.

## XIX. EXCLUSIONS

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

A. **Prior Litigation**

   based upon, directly or indirectly arising out of, or in any way involving facts alleged in any litigation against the **Insured** pending on or prior to the inception date of this Policy, or renewal thereof;

B. **Prior Wrongful Acts of Broker/Dealers**

   based upon, directly or indirectly arising out of, or in any way involving any actual or alleged **Wrongful Acts** or **Interrelated Wrongful Acts** by, or liability of, any **Broker/Dealer** acquired by an **Insured**, where such **Wrongful Acts** or **Interrelated Wrongful Acts** were committed, attempted, or allegedly committed or attempted prior to such acquisition;

C. **Claims by Specified Persons or Entities**

   by or on behalf of, or for the benefit of, whether directly or indirectly,
   1. any parent, spouse, **Domestic Partner**, or child of the **Insured**;
   2. an entity in which one or more **Insureds**, at the time of the **Wrongful Act** giving rise to a **Claim**:
      i. had a total of ten percent (10%) or more equity interest, or
      ii. operated, controlled, or managed;
   3. an individual or entity which has, or did have at the time of the **Wrongful Act**, a total of ten percent (10%) or more equity interest in an entity **Insured** or operates, controls or manages an entity **Insured**;
   4. any past or present **Insured**, whether it be an individual, class or derivative action, except and to the extent that such **Claim** is by an **Insured** in his or her capacity as a **Client**;
   5. any clearing agency or arising out of any function of any **Insured** as a clearing agency;
   6. any **Broker/Dealer** other than one which buys, sells or trades in securities exclusively as a principal for its own account;

© CNA All rights reserved.



7.   any governmental or quasi-governmental official or agency, including but not limited to any state or federal securities or insurance commission or agency, in any capacity;

8.   any self-regulatory organization including, but not limited to, the Securities and Exchange Commission, the Financial Industry Regulatory Authority, the Securities Investor Protection Corporation, in any capacity,

provided, however, that paragraphs 7. and 8. above shall not apply to any **Claim** by an official of such agency or organization if such official is bringing the **Claim** in his or her capacity as a direct **Client** of an **Insured** and not as an official of such agency or organization;

D.   **Intentional Acts**

based upon, directly or indirectly arising out of, or in any way involving any actual dishonest, deliberately fraudulent, criminal, malicious, purposeful or intentional act, error or omission, or any actual willful violation of any statute or law as determined by a final adjudication in the underlying action or in a separate action or proceeding; however, the **Wrongful Act** of any **Insured** individual shall not be imputed to any other **Insured** individual; and only the **Wrongful Act** of any executive officer shall be imputed to an **Insured** entity;

If the allegations above are subsequently proven true **Insured** shall reimburse the Insurer for all **Defense Costs** incurred by the Insurer;

E.   **Bodily Injury/Property Damage**

based upon, directly or indirectly arising out of, or in any way involving any actual or alleged bodily injury, sickness, disease, emotional distress, mental anguish or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

F.   **Contractual Liability/Promises/Guarantees**

based upon, directly or indirectly arising out of, or in any way involving actual or alleged:
1.   liability of others assumed by an **Insured** under any contract or agreement; provided, however, that this paragraph shall not apply to the extent that the liability would attach to an **Insured** in the absence of such contract or agreement; or
2.   making or stating of any promises or guarantees as to interest rates or fluctuations in interest rates, the market value of any investment or insurance product, or future premium payments;

G.   **Specified Services**

based upon, directly or indirectly arising out of, or in any way involving actual or alleged:
1.   performance of or failure to perform services by the **Insured** as:
   a.   an actuary, accountant, attorney, property or casualty agent, real estate agent, or third party administrator; or
   b.   a market maker or specialist in any securities; or
2.   tax advice provided by the **Insured** except to the extent that such tax advice is an incidental part of the **Professional Services** being rendered;

H.   **Premium/claim/tax monies**

based upon, directly or indirectly arising out of, or in any way involving:
1.   the **Insured**'s inability or refusal to pay or collect premium, claim or tax monies; or

© CNA  All rights reserved.



2.  a dispute over fees, commissions or charges, including without limitation the structure of fees or excessive fees; however, this paragraph 2. shall not apply to surrender charges;

I.  **Commingling/Illegal Profit**

based upon, directly or indirectly arising out of, or in any way involving:
1.  any actual or alleged commingling or use of **Client** funds; or
2.  any actual or alleged profit, remuneration or pecuniary advantage gained by any **Insured**, to which the **Insured** was not legally entitled;
as determined by a final adjudication in the underlying action or in a separate action or proceeding.

J.  **Insolvency**

based upon, directly or indirectly arising out of, or in any way involving the insolvency, receivership, conservatorship, liquidation, bankruptcy or inability to pay of a natural person, entity, benefit plan, insurance company, managed health care organization, reinsurer, risk retention group or captive (or any self insurance plan or trust by whatsoever name), or limited partnership in which the **Insured** has placed business or obtained insurance coverage, or placed or recommended placement of the funds of a **Client**; provided, however, that if such **Claim** arises from the **Insured's** placement of coverage with any insurance company with an A.M. Best financial strength rating of "A-" or better rating at the time of placement, the Insurer shall have the right and duty to defend the **Insured**. The Insurer shall only be liable for payment of **Defense Costs** for such a **Claim** and not for payment of any **Loss** other than **Defense Costs**, subject always to the following Limits of Liability:

$250,000 per **Claim**/$250,000 Aggregate per **Insured**/ $500,000 Total Policy Aggregate for all **Insureds** regardless of the number of **Claims**.

The Insurer shall not be liable for any **Loss,** including **Defense Costs,** once the aforementioned limits have been exhausted;

K.  **Employee Benefit Plans**

based upon, directly or indirectly arising out of, or in any way involving:
1.  any actual or alleged pension, profit sharing, health and welfare or other employee benefit plan or trust sponsored by the **Insured** or any entity owned or controlled by the **Insured** or in which the **Insured** is a participant, trustee or named fiduciary, as defined under the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law; or
2.  the actual or alleged design of any employee benefit plan;

L.  **Sale or Servicing of Certain Products**

based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, attempted sale or servicing of any:
1.  coverage, alleged coverage or plan placed with any form of Multiple Employer Welfare Arrangement as defined by the Employee Retirement Income Security Act of 1974, as amended, or any employee benefits plan involving self funding in whole or in part, by any employer, union, or employment related entity;

© CNA  All rights reserved.



2.      commodities, commodities futures contracts, or any type of option contract with the exception of covered call writing;
3.      promissory notes;
4.      ETS pay phone investments or other similar type investments;
5.      viatical settlements, viatical insurance benefits, viatical investment pools or any security backed by viatical settlements;
6.      "Stranger Originated Life Insurance (STOLI)" or "Speculator Initiated Life Insurance (SPINLIFE);"
7.      Structured settlements, structured notes, principal protected notes, or reverse convertible notes;
8.      Life Settlements; Reverse mortgages or similar transactions in which the present value of a conditional contract is exchanged or sold;
9.      issuer callable certificates of deposit and/or equipment sale-lease-buy-back transactions of any kind; or
10.      Leveraged or Inverse Products, including but not limited to Exchange Traded Funds or Mutual Funds, or Exchange Traded Notes;
11.      any plans created under sections 412 and 419 of the internal revenue code;
12.      any insurance sold as part of or to be used in conjunction with or to fund any plan created under sections 412 or 419 of the internal revenue code;
13.      any life insurance policy in which the premium was paid for, in whole or in part, by or through any premium finance mechanism or any premium finance company.

M.     **Discretionary Authority**

based upon, directly or indirectly arising out of, or in any way involving any actual or alleged activities in connection with the exercise of discretionary authority with regard to the management or disposition of assets (whether for individuals, groups, employee benefit plans, or other entities of whatever legal form or character);

N.     **Nuclear/Pollution**

based upon, directly or indirectly arising out of, or in any way involving:
1.      any nuclear reaction, radiation or contamination; or
2.      any actual, alleged or threatened discharge, release, escape, or disposal of, or exposure to, **Pollutants**; any request, direction or order that any of the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effect of **Pollutants** or nuclear reaction, radiation or contamination, or any voluntary decision to do so; or any actual or alleged property damage, or bodily injury, sickness, disease or death of any person, or financial loss to the **Insureds**, their security holders, or their creditors resulting from any of the aforementioned matters;

O.     **Anti-trust**

based upon, directly or indirectly arising out of, or in any way involving actual or alleged price fixing, price discrimination, predatory pricing, restraint of trade, antitrust, monopolization, unfair trade, or unfair anti-competitive conduct; however, the knowledge of any such act by any **Insured** individual shall not be imputed to any other **Insured** individual; and only such knowledge of an executive officer shall be imputed to an **Insured** entity;

P.     **Confidential or non-public information**

based upon, directly or indirectly arising out of or in any way involving the actual or alleged use, misuse or disclosure of:

© CNA  All rights reserved.



1.    confidential information, including but not limited to such use for the purpose of replacement of coverage; or

2.    non-public information in a manner prohibited by the laws of the United States, including, but not limited to, the Insider Trading and Securities Fraud Enforcement Act of 1988, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, any similar laws of any other jurisdiction, or any rules or regulations promulgated under any of the foregoing, all as amended;

Q.   **Unlicensed entity**

based upon, directly or indirectly, arising out of or in any way involving the placement of a **Client's** coverage or funds directly or indirectly with any organization, entity or vehicle of any kind, nature or structure which is not licensed to do business in the state or jurisdiction with authority to regulate such business; however, this Exclusion shall not apply to any **Claim** arising from or contributed to by the placement of a **Client's** coverage or funds directly or indirectly with such organization, entity or vehicle which is an eligible surplus lines insurer in the state or jurisdiction with authority to regulate such business;

R.   **Securities below Minimum Capitalization Levels**

based upon, directly or indirectly arising out of, or in any way involving any security issued by an entity unable to meet the minimum capitalization and other standards for listing and maintenance on the NASDAQ SmallCap Market;

S.   **Owned funds or investment products**

based upon, directly or indirectly arising out of, or in any way involving any proprietary fund or investment products in which an **Agent or General Agent** or **Registered Representative** has any ownership interest;

T.   **Fiduciary Services**

based upon, directly or indirectly arising out of, or in any way involving investment advice provided by a:

1.    Fiduciary Adviser if such investment advice is not provided pursuant to and in accordance with all of the requirements of the Pension Protection Act of 2006 as it may be amended; or

2.    Fiduciary Adviser pursuant to section 3(38) of the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law.

U.   **Wrongful Employment Practices**

based upon, directly or indirectly arising out of, or in any way involving employment practices including but not limited to discrimination or termination of employment;

V.   **Class Actions**

brought by one party, or a group of parties, as representatives of a larger class including any Claim brought in federal court that is governed by Federal Rule of Civil Procedure 23.

W.   **Bernard Madoff Investments**

© CNA  All rights reserved.



which is a **Madoff Claim**.

**XX. TRADE EMBARGOES AND SANCTIONS**

This Policy does not provide coverage for **Insureds**, transactions or that part of **Loss** that is uninsurable under the laws or regulations of the United States concerning trade or economic sanctions.

**XXI. DUTIES OF THE POLICYHOLDER**

The **Policyholder**, on behalf of all of all **Insureds**, will be:

A.      authorized to make changes in the terms of this Policy with our written consent; and

B.      responsible for:
1.      the payment of all premiums due the Insurer; and
2.      keeping records of the information the Insurer needs for premium computation, and sending it copies as it may request.

**XXII. LIBERALIZATION CLAUSE**

In the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the **Insured**, provided however, that this shall not apply to the extent that the more favorable amendatory endorsement or Policy provision is against public policy or the law of such state.

**XXIII. INTERPRETATION**

Any rule of contract construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting this Policy. The language in this Policy shall be interpreted as to its fair meaning and not strictly for or against any party thereof.

**XXIV. HEADINGS AND NUMBER**

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage. Defined terms in the singular also include the plural and defined terms in the plural also include the singular.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy shall not be binding upon us unless completed by the attachment of the Declarations.

Chairman                                                    Secretary

© CNA  All rights reserved

Exhibit A
Page 24



## THE FINANCIAL SALES PROFESSIONALS PURCHASING GROUP
## EXCLUDE SPECIFIC INDIVIDUALS

In consideration of the premium charged, it is hereby understood and agreed that Section **XX. EXCLUSIONS** of the Policy is amended to add the following new exclusion:

- based upon, directly or indirectly arising out of, or in any way involving Richard Manuel, Joe Sackey, Ronald G. Koblick, Robert W. Larsen.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

Policy No: 425391280
Endorsement No: 1
Effective Date:

Exhibit A
Page 25

© CNA All Rights Reserved.



## SERVICE OF SUIT

Wherever used in this endorsement Named Insured means the first person or entity named on the declarations page.

In consideration of the premium paid for this Policy, it is agreed that the following provision is added to the Policy:

SERVICE OF SUIT

In the event the Insurer fails to pay an amount claimed to be due hereunder, the Insurer, at the request of the Named Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing herein constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of an action to another court as permitted by law.

Service of process in such suit shall be made upon

General Counsel<br>
Columbia Casualty Company<br>
333 S. Wabash Ave.<br>
Chicago, IL 60604

and in any suit instituted against such person upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The General Counsel is authorized and directed to accept service of process on behalf of the Insurer in any such suit and, upon the request of the Named Insured, to give a written undertaking to the Named Insured that he will enter a general appearance upon the Insurer's behalf in the event such suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or true copy thereof.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy and expires concurrently with said Policy unless another effective date is shown below.

By Authorized Representative _____
(No signature is required if issued with the Policy or if it is effective on the Policy Effective Date)

Policy No: 425391280
Endorsement No: 2
Effective Date:

© CNA  All Rights Reserved.

Exhibit A
Page 26



## TIE IN LIMITS ENDORSEMENT
### (KENTUCKY MASTER)

In consideration of the premium paid, it is hereby understood and agreed that any payment of **Loss** under the **Kentucky Policy**, shall constitute **Loss** under this Policy and shall erode both this Policy's Limit of Liability and applicable Retention.

The maximum aggregate Limit of Liability for each **Insured** shall be the total Limit of Liability shown in Item 6. of the **Insured's** Certificate of Insurance.

Nothing contained in this Endorsement shall serve to increase the total aggregate Limits of Liability stated in Item 6 of the Declarations.

As used herein, **Kentucky Policy** means Policy # 596465988 issued by Continental Casualty to Kentucky Agents of The Financial Sales Professionals Purchasing Group with an effective date of July 1, 2014.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA78911XX (5-14)
Page 1

Policy No: 425391280
Endorsement No: 3
Effective Date:

© CNA All Rights Reserved.

Exhibit A
Page 27



**NEW YORK AMENDATORY ENDORSEMENT**
**Applicable to Policy Form No. 40129 XX**

This forms a part of Policy Number 425391280 issued to the **Policyholder** by the Insurer. In consideration of the premium charged, it is hereby understood and agreed that solely with respect to those **Agents, General Agents, Registered Representatives** and **Registered Investment Advisers** insured under this Policy, who are residents of or practice in New York State, the Policy is amended as follows:

1. The Notice and introductory paragraph on page 1 is deleted in its entirety and replaced as follows:

  **NOTICE: THIS IS A CLAIMS MADE POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST AN INSURED AND REPORTED TO THE INSURER DURING THE COVERAGE RELATIONSHIP OR REPORTED TO THE INSURER WITHIN 30 DAYS THEREAFTER AS ALLOWED UNDER THE TERMS OF THIS POLICY OR ANY APPLICABLE EXTENDED REPORTING PERIOD. NO COVERAGE EXISTS FOR CLAIMS FIRST REPORTED AFTER THE END OF THE COVERAGE RELATIONSHIP UNLESS, AND TO THE EXTENT THAT, THE EXTENDED REPORTING PERIOD APPLIES.**

  **DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTION. THIS COULD RESULT IN THE LIMIT OF LIABILITY BECOMING COMPLETELY EXHAUSTED BY THE PAYMENT OF DEFENSE COSTS, IN WHICH CASE, NO FURTHER COVERAGE IS PROVIDED BY THIS POLICY. PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

2. The introductory paragraph on page 1 of the Policy is deleted in its entirety and replaced as follows:

  The Insurer, the **Policyholder** and the **Insureds** agree as follows, in consideration of the payment of the premium and in reliance upon all statements made in the **Application** furnished to the Insurer designated in the **Policyholder's** Declarations and the **Insured's Certificate of Insurance**, a stock insurance corporation, hereafter called the "Insurer".

3. Section I. INSURING AGREEMENTS, Paragraph C. **HOW THIS COVERAGE APPLIES**, subparagraph 2. is deleted in its entirety and replaced as follows:

  C. **HOW THIS COVERAGE APPLIES**

    2. the **Claim** is first made against any **Insured** under Insuring Agreement A. during the **Certificate Period**, or under Insuring Agreement B., during the **Policy Period**, or any **Extended Reporting Period**, if applicable, and reported to the Insurer in accordance with Section VII, NOTICE; and

4. Section II. DEFENSE, Paragraph A. is deleted in its entirety and replaced as follows:

  A. Defense of **Claims**
    1. If a **Claim** is made against the **Insured** within the United States of America, its territories or possessions or Canada, the Insurer shall have the right and duty to defend such **Claim**, even if any of the allegations of the **Claim** are groundless, false or fraudulent.

      The Insurer shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as it deems necessary. The **Insureds** or **Policyholder**, as applicable, shall have the option to:
      a. select the defense attorney or to consent to the Insurer's choice of defense attorney, which consent shall not be unreasonably withheld;
      b. participate in, and assist in the direction of, the defense of any **Claim**; and
      c. consent to a settlement, which consent shall not be unreasonably withheld.

      Subject to paragraph 2. below, the Insurer's obligation to defend any **Claim** or pay any **Loss**, shall be completely fulfilled and extinguished if the limit of liability has been exhausted by payment of **Loss**.

GSL40221NY (6-13)
Page 1

Policy No:  425391280
Endorsement No:  4
Effective Date:

© CNA All Rights Reserved.

Exhibit A
Page 28



2.    Limitation on the Insurer's Duty to Defend

If the Insurer concludes that the Limit of Liability applicable to a **Claim** may become exhausted prior to the conclusion of any **Claim**, the Insurer will notify the **Insureds**, in writing, to that effect.

When the Limit of Liability applicable to a **Claim** has actually been exhausted prior to the conclusion of the **Claim**, the Insurer will notify the **Insured,** in writing, as soon as practicable, that such limit has been exhausted and that the Insurer's duty to defend such **Claim** and any other **Claim** has ended.

The Insurer will initiate, and cooperate in, the transfer of control to the **Insured**, of any **Claims** which were subject to that Limit of Liability and which were reported to the Insurer prior to the exhaustion of such limit. The **Insured** must cooperate in the transfer of control of such **Claims**.

The Insurer agrees to take the necessary steps as the Insurer deems appropriate to avoid a default in, or continue the defense of, such **Claims** until such transfer has been completed, provided that the **Insureds** are cooperating in completing such transfer.

The **Insured** must reimburse the Insurer for expenses the Insurer incurs in taking those steps the Insurer deems appropriate to avoid a default in, or continuing the defense of, any **Claim**.

The Insurer will not take any action with respect to any **Claim** that would have been subject to such Limit of Liability, had it not been exhausted, if the **Claim** is reported to the Insurer after that limit has been exhausted.

The exhaustion of any limit by payment of any **Claim**, and the resulting end of the Insurer's duty to defend, will not be affected by the Insurer's failure to comply with any of the terms and conditions of this provision.

5.    Section III. DEFINITIONS is amended to add the following new definitions:

- **Certificate of Insurance** means the document issued to each **Insured** evidencing the terms, limits, premium and endorsements provided to the **Insured**.

- **Certificate Period** means the period of time between the inception date shown on the **Certificate of Insurance** and the effective date of termination, expiration or cancellation of the **Certificate of Insurance** issued to **Insured**

- **Class Action Claim** means a **Claim** under which one party, or a group of parties, sue as representatives of a larger class. **Claims** brought in federal court are governed by Federal Rule of Civil Procedure 23.

- **Coverage Relationship** means that period of time between the effective date of the first claims-made **Certificate of Insurance** issued by the insurer to the **Insured** and the cancellation or nonrenewal of the last consecutive claims-made **Certificate of Insurance** issued by the Insurer to the **Insured,** where there has been no gap in coverage, but does not include any period covered by **Extended Reporting Period**.

- **Extended Reporting Period** means the period of time after the **Coverage Relationship** for reporting **Claims** due to a **Wrongful Act**. The **Wrongful Act** must happen on or after the **Prior Acts Date** and before the end of the **Coverage Relationship**.

6.    Section III. DEFINITIONS is amended as follows:

A.    The definitions of **Policy Period**, **Policyholder** and **Pollutants** are each deleted in its entirety and replaced as follows:

**Policy Period** means the period from the effective date of this Policy to the Policy expiration date stated in Item 3 of the **Policyholder's** Declarations, or its earlier cancellation date.

GSL40221NY (6-13)
Page 2

Policy No:    425391280
Endorsement No:    4
Effective Date:

© CNA  All Rights Reserved.

Exhibit A
Page 29



Policyholder means the person or organization named in Item 1 of the Policyholder's Declarations.

Pollutants means, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste (including materials to be recycled, reconditioned or reclaimed).

B. The definition of **Agent or General Agent**, paragraph A. is deleted in its entirety and replaced as follows:

    A. a natural person who has or had maintained a life agent contract with the **Policyholder** (if a life insurance company), or with a life insurance company subsidiary of the **Policyholder**) and to whom the Insurer has issued a **Certificate of Insurance**; and

C. The definition of **Registered Representative**, paragraph A. is deleted in its entirety and replaced as follows:

    A. a natural person who is registered with the Financial Industry Regulatory Authority as a registered representative or registered principal, who has or had maintained a contract with a **Broker/Dealer** who has or had elected to enroll for coverage under this Policy, and whose enrollment is or was on file with the **Policyholder** and to whom the insurer has issued a **Certificate of Insurance**; or

D. The definition of **Insured** is amended to add the following new language at the end:

    **Insured** shall not include **Policyholder**.

E. The first paragraph of the definition of **Loss** is deleted in its entirety and replaced as follows:

    **Loss** means monetary settlements or monetary judgments (including any award of pre-judgment interest) and **Defense Costs** for which the **Insured** is legally obligated to pay on account of a covered **Claim**.

F. The definition of **Administration of Employee Benefit Plans** is deleted in its entirety and replaced as follows:

    **Administration of Employee Benefit Plans** means consultation, other than legal advice, with participants in an employee benefit plan in order to explain the provisions of such plan and handling day-to-day ministerial functions required by such plan, including without limitation enrollment, record keeping and filing reports with government agencies. **Administration of Employee Benefit Plans** also includes third party claims administration.

7. Section IV. EXTENDED REPORTING PERIOD is deleted in its entirety and replaced as follows:

A. The provisions of the **Extended Reporting Period** coverage will not apply, except for the one year automatic **Extended Reporting Period** if the **Coverage Relationship** has been less than one year and the **Certificate of Insurance** was terminated for nonpayment of premium or fraud.

B. In the event of **Termination of Coverage** a one year automatic **Extended Reporting Period**, extension will be granted to the **Insured**, at no additional charge, only with respect to **Claims** made against the **Insured** and reported to the Insurer during such extension by reason of any **Wrongful Act** committed before the **Termination of Coverage**. The automatic **Extended Reporting Period** does not create any separate or additional Limit of Liability.

C. Within thirty days after termination of the **Certificate of Insurance**, the Insurer will notify the **Insured**, in writing, of the automatic one year **Extended Reporting Period**. The Insurer will also notify the **Insured** of the availability of, the premium for, and the importance of purchasing an additional **Extended Reporting Period**. The **Extended Reporting Period** described in Item 5a shall be three years, inclusive of the one

---

GSL40221NY (6-13)
Page 3

Policy No: 425391280
Endorsement No: 4
Effective Date:

© CNA All Rights Reserved.

Exhibit A
Page 30



year period specified in paragraph B. above and the premium shall be computed in accordance with the rates in effect when the **Certificate of Insurance** was last issued or renewed. ' The premium to be charged for the additional **Extended Reporting Period** coverage shall be based upon the rates for such coverage in effect on the date this **Certificate of Insurance** was issued or last renewed and shall be for three years at 200% of such premium.

D.   The **Insured** shall have the greater of 60 days from the effective date of **Termination of Coverage** or 30 days from the date of mailing or delivery of the advice of the availability to purchase the additional **Extended Reporting Period** coverage, to submit written acceptance of the additional **Extended Reporting Period** coverage. The premium for such additional **Extended Reporting Period** must be paid promptly when due. The premium shall be fully earned at the inception of this endorsement.

E.   If the **Insured** has been placed in receivership, liquidation or bankruptcy or permanently ceases operations, then any one qualifying as an **Insured** has the right to an **Extended Reporting Period** issued in the name of the **Insured** for the benefit of all **Insureds**. The request for such **Extended Reporting Period** coverage must be made within 120 days of the **Termination of Coverage**.

F.   Upon termination of this **Certificate of Insurance**:
　　i.    any return premium due the **Insured** shall be credited toward the premium for the additional **Extended Reporting Period** coverage if the **Insured** elects such coverage.
　　ii.   where premium is due to the Insurer for coverage during the **Coverage Relationship**, any monies received by the Insurer from the **Insured** as payment for the **Extended Reporting Period** coverage shall first be applied to such premium owing for this **Certificate of Insurance**.

G.   In order to purchase the **Extended Reporting Period**, the total premium for the **Insured's Certificate of Insurance** must have been paid.

H.   If the **Extended Reporting Period** is purchased, the entire premium shall be deemed earned at its commencement without any obligation by the Insurer to return any portion thereof.

I.   Limits of Liability for such additional **Extended Reporting Period** shall be:
　　i.    at least equal to 100 percent of the **Certificate of Insurance**'s applicable annual aggregate limit where a **Coverage Relationship** has continued for three years or more; or
　　ii.   if the **Coverage Relationship** has continued for less than three years, the Limit of Liability shall be at least equal to the greater of:
　　　　a.   the amount of coverage remaining in such **Certificate of Insurance**'s applicable annual aggregate Limit of Liability, or
　　　　b.   50 percent of such **Certificate of Insurance**'s annual aggregate Limit of Liability.

8.   Section VI. ESTATES, LEGAL REPRESENTATIVES AND SPOUSES is deleted in its entirety and replaced as follows:

**VI.   ESTATES, LEGAL REPRESENTATIVES AND SPOUSES**

The estates, heirs, legal representatives, assigns or spouses of **Insureds**, shall be considered **Insureds** under this Policy; provided however, that coverage is afforded to such estates, heirs, legal representatives, assigns or spouses only for a **Claim** arising solely out of their status as such and, in the case of a spouse, where such **Claim** seeks damages from marital community property, jointly-held property or property transferred from the **Insured** to the spouse. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign or spouse. All terms and conditions of this Policy, including without limitation the Retention applicable to **Loss** incurred by the **Insured** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns or spouses.

9.   Section VI. LIMIT OF LIABILITY, RETENTION AND ALLOCATION is deleted in its entirety and replaced as follows:

GSL40221NY (6-13)
Page 4

Policy No:   425391280
Endorsement No:   4
Effective Date:

© CNA  All Rights Reserved.



A.    Professional Liability Insuring Agreement A.

If a Limit of Liability is set forth in the **Insured's Certificate of Insurance** for the applicable **Insured** under the Professional Liability Insuring Agreement A., such Scheduled Limit of Liability shall apply separately to each applicable **Insured** covered under such Insuring Agreement as follows:

1.    Each **Claim**

Subject to paragraph 2. below, the Limit of Liability of the Insurer for **Loss** for each **Claim** first made against an **Insured** and reported to the Insurer during the **Certificate Period** shall not exceed the amount stated in the Declarations for each **Claim.**

2.    Aggregate

The Limit of Liability of the Insurer for **Loss** for all **Claims** first made against an **Insured** and reported to the Insurer during the **Policy Period** shall not exceed the amount stated in the **Insured's Certificate of Insurance** for all **Claims** in the Aggregate.

If the Scheduled Limits of Liability for Insuring Agreement A., as set forth in the **Insured's Certificate of Insurance** include more than one option, only one Limit of Liability option shall be available to each **Insured** and such option shall be the option identified in the written records of the **Policyholder**, subject to the maximum aggregate Limit of Liability as set for in this Section VI.

B.    Vicarious Liability - Insuring Agreement B. (where included)

If Insuring Agreement B. is included, no additional Limit of Liability is afforded under Insuring Agreement B. Rather; the Limit of Liability applicable to **Claims** under Insuring Agreement B. shall be the Limit of Liability under Insuring Agreement A. applicable to the **Agent or General Agent** named as a co-defendant with the **Insured** entity under Insuring Agreement B.

C.    Exhaustion of Limit of Liability

The Insurer's obligations under this Policy shall be deemed completely fulfilled and extinguished if the applicable Limit of Liability is exhausted by payment of **Loss.**

D.    Retention

Subject to the applicable Limit of Liability, the Insurer shall pay all covered **Loss** excess of the applicable Retention, if any, set forth in the **Insured's Certificate of Insurance**. The scheduled Retentions shall apply separately to each **Insured** as follows:

A single and separate Retention shall apply to all **Loss** resulting from each **Claim**. If more than one Retention is applicable to a single **Claim**, the maximum aggregate Retention for such **Claim** shall be the largest of such Retentions.

If the Insurer, in the exercise of its discretion and without any obligation to do so, pays any amount within the amount of the applicable Retention, the **Insured** shall be liable to the Insurer for any and all such amounts and, upon demand, shall pay such amounts to the Insurer.

E.    **Interrelated Wrongful Acts**

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed to have been made on the earlier of:

A.    the date on which the earliest such **Claim** was first made; or

---

GSL40221NY (6-13)
Page 5

Policy No:    425391280
Endorsement No:    4
Effective Date:

© CNA  All Rights Reserved.



B. the first date valid notice was given by an **Insured** and received by the Insurer under this Policy of any **Wrongful Act** or under any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event or transaction which underlies any such **Claim**.

F. Allocation

If a **Claim** made against the **Insureds** includes both covered and uncovered matters or if a **Claim** is made against **Insureds** who are extended coverage under this Policy and others who are not extended coverage therefore under this Policy, the **Insureds** agree that there must be an allocation between insured and uninsured **Loss** (other than that part of **Loss** attributable to **Defense Costs**). The **Insureds** and the Insurer shall exert their best efforts to agree upon a fair and proper allocation between such insured and uninsured **Loss** based upon the relative legal exposures of the parties to such matters.

10. Section VII. NOTICE is amended as follows:

A. The first sentence of paragraph A is deleted in its entirety and replaced as follows:

If a **Claim** is made against any **Insured** or the **Policyholder**, the **Insured** or the **Policyholder,** as applicable**,** shall give written notice to the Insurer or any of the Insurer's licensed agents, of such a **Claim** as soon as practicable during the **Coverage Relationship** and forward to the Insurer every demand, notice, summons or other process received.

B. The first sentence of paragraph B up to the colon is deleted in its entirety and replaced as follows:

If, during the **Insured's Certificate Period,** or the **Extended Reporting Period,** if applicable, an **Insured** first becomes aware of any **Wrongful Act** which may reasonably give rise to a future **Claim** and during such period give written notice to the Insurer or any of the Insurer's licensed agents, of:

C. Paragraph D is deleted in its entirety and replaced as follows:

The **Insureds** shall give written notice under this Policy to the Insurer or any of the Insurer's licensed agents as specified in the **Certificate of Insurance**, which shall be effective upon receipt. Failure to give any notice required to be given by paragraphs A, B and C above, within the time prescribed therein shall not invalidate any Claim made by the **Insured** or by any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible.

11. Section VIII. CANCELLATION is renamed CANCELLATION/NONRENEWAL OF POLICY and is amended to delete paragraph A.2. and add a new paragraph as follows:

Nonrenewal/Conditional Renewal

a. If the Insurer elects not to renew this Policy, the Insurer shall send notice as provided in paragraph c. below along with the reason for nonrenewal.

b. If the Insurer conditions renewal of this Policy upon:
   i. change of limits;
   ii. change in type of coverage;
   iii. reduction of coverage;
   iv. increased deductible;
   v. addition of exclusion;
   vi. increased premiums in excess of 10%, exclusive of any premium increased due to and commensurate with insured value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

GSL40221NY (6-13)
Page 6

Policy No: 425391280
Endorsement No: 4
Effective Date:

© CNA  All Rights Reserved.

Exhibit A
Page 33



the Insurer shall send notice as provided in paragraph c.i. below.

c.    Notice of nonrenewal and conditional renewal will be provided as follows:

    i.    If the Insurer decides not to renew this Policy or to conditionally renew this Policy as provided in paragraphs a. and b. above, the Insurer shall mail or deliver written notice to the **Policyholder** at least 60 but not more than 120 days before the expiration date.

    ii.    Notice will be mailed or delivered to the **Policyholder** at the address shown in the Policy and its authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

    iii.    the Insurer will not send the **Policyholder** notice of non-renewal or conditional renewal if the **Policyholder** or its authorized agent or broker or another insurer of the **Policyholder** mails or delivers notice that this Policy has been replaced or no longer desired.

12.    A new section is added as follows:

**CANCELLATION/NONRENEWAL/CONDITIONAL RENEWAL OF CERTIFICATE OF INSURANCE**

A.    Cancellation of **Certificate of Insurance**

1.    The **Insured** has the right to cancel their **Certificate of Insurance** at any time by giving notice to the Insurer stating when thereafter the cancellation shall be effective. If the **Certificate of Insurance** is so canceled, earned premium shall be computed pro rata.

2.    If the **Certificate of Insurance** has been in effect for 60 days or less, the **Certificate of Insurance** may be canceled by the Insurer by mailing or delivering to the **Insured** written notice stating the reason for cancellation at the mailing address shown on the **Certificate of Insurance**, and to the **Insured's** authorized agent or broker at least:

    a.    20 days before the effective date of cancellation if the **Certificate of Insurance** is canceled for any reason not included in paragraph (b) below.

    b.    15 days before the effective date of cancellation if the **Certificate of Insurance** is canceled for any of the following reasons:

        i.    nonpayment of premium;

        ii.    conviction of a crime;

        iii.    discovery of fraud or material misrepresentation in the obtaining of the **Certificate of Insurance** or in the presentation of a **Claim**;

        iv.    after issuance of the **Certificate of Insurance** or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Certificate Period**;

        v.    material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the **Certificate of Insurance**, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the **Certificate of Insurance** was issued or last renewed;

        vi.    required pursuant to a determination by the New York State Superintendent of Insurance that continuation of the Insurer's present premium volume would jeopardize the Insurer's solvency or be hazardous to the interest of the Insurer's policyholders, creditors or the public;

        vii.    a determination by such Superintendent that the continuation of the **Certificate of Insurance** would violate, or would place the insurer in violation of, any provision of the New York Insurance Code; or

        viii.    revocation or suspension of the **Insured's** license to provide **Professional Services**.

Policy No:   425391280
Endorsement No:   4
Effective Date:

Exhibit A
Page 34

© CNA  All Rights Reserved.



3. If the **Certificate of Insurance** has been in effect for more than 60 days, or if this **Certificate of Insurance** is a renewal or continuation of a **Certificate of Insurance** issued by the insurer, this **Certificate of Insurance** may be canceled by the **Insurer** only for any of the reasons listed in paragraph A.2.b. above provided a written notice stating the reason for cancellation is mailed or delivered to the **Insured** at the address shown in the **Certificate of Insurance**, and his or her authorized agent or broker at least 15 days before the effective date of cancellation.

   a. Notice of cancellation will state the effective date of cancellation. The notice of cancellation for nonpayment of premium will include the amount of premium due. The **Certificate Period** will end on this date. If notice is mailed, proof of mailing will be sufficient proof of notice.

   b. If the **Insured** cancels, earned premium will be computed in accordance with the customary short rate table and procedure. If the Insurer cancels, earned premium shall be computed pro rata. However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, the Insurer will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

   c. If one of the reasons for cancellation set forth in Paragraph A.2.b. exists, the Insurer may cancel this entire **Certificate of Insurance**, even if the reason for cancellation pertains only to a new coverage or endorsement initially effective subsequent to the original issuance of this **Certificate of Insurance**.

B. Nonrenewal

   1. If the Insurer elects not to renew this **Certificate of Insurance**, the Insurer shall send notice as provided in paragraph 2. below along with the reason for nonrenewal.

   2. Notice of nonrenewal and conditional renewal will be provided as follows:

      a. If the Insurer decides not to renew this **Certificate of Insurance** as provided in paragraph 1. above, the Insurer shall mail or deliver written notice to each **Insured** at least 60 but not more than 120 days before:
         i. the expiration date; or
         ii. the anniversary date if this is a continuous **Certificate of Insurance**.

      b. Notice will be mailed or delivered to each **Insured** at the address shown in the **Certificate of Insurance** and his or her authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice.

      c. the Insurer will not send the **Insured** notice of non-renewal if the **Insured** or its authorized agent or broker or another insurer of the **Insured** mails or delivers notice that this **Certificate of Insurance** has been replaced or no longer desired.

C. If the Insurer violates any of the provisions of the paragraphs above by sending the **Insured** an incomplete or late conditional renewal notice or a late nonrenewal notice:

   1. Coverage will remain in effect at the same terms and conditions of this **Certificate of Insurance** at the lower of the current rates or the prior **Certificate Period's** rates until 60 days after such notice is mailed or delivered, unless the **Insured,** during this 60 day period, has replaced the coverage or elects to cancel.

   2. On or after the expiration date of this **Certificate Period's**, coverage will remain in effect at the same terms and conditions of this **Certificate Period's** for another **Certificate Period's** at the lower of the current rates or the prior period's rates, unless the **Insured,** during this **Certificate Period's**, has replaced the coverage or elects to cancel.

13. Section IX. OTHER INSURANCE is deleted in its entirety and replaced as follows:

GSL40221NY (6-13)
Page 8

Policy No: 425391280
Endorsement No: 4
Effective Date:

Exhibit A
Page 35

© CNA  All Rights Reserved.



### IX. OTHER INSURANCE

If any **Loss** resulting from any **Claim** is insured under any other policies, this Policy shall apply only to the extent the **Loss** exceeds the amount paid under such other valid and collectible insurance whether such other valid and collectible insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other valid and collectible insurance is written only as specific excess insurance over this Policy.

14. Section XIX. EXCLUSIONS is amended as follows:

    A.    Paragraph A., **Prior Litigation** is amended to add the words "or **Policyholder**" after the first use of the word "**Insured**."

    B.    Paragraph N. **Nuclear/Pollution** is amended as follows:

        1.    The title is changed from "**Nuclear/Pollution**" to "**Pollution**".

        2.    The phrase "nuclear reaction, radiation or contamination," is removed from the exclusion.

    C.    Exclusion J. **Insolvency**, is deleted in its entirety and replaced as follows:

        J.    **Insolvency**

        based upon, arising out of, due to or involving directly or indirectly the insolvency, receivership, liquidation or inability to pay, of any insurance carrier, broker/dealer, trust or investment vehicle in which the **Insured** has placed or obtained coverage for a client or an account; however, notwithstanding the foregoing, the Insurer shall have the right and duty to defend the **Insured** in any suit alleging described above, provided:

        However, this exclusion does not apply:

        a.    to any **Claim** arising from the **Insured's** placement of coverage with an admitted Insurer with an A.M. Best rating of "A-" or better rating at the time the **Insured** initially placed the risk with such Insurer; or

        b.    to any entity described above, if the entity was authorized or operated by a government body or bodies pursuant to statute or regulation, including assigned risk plans, joint underwriting associations, pools, FAIR Plans, or other residual market mechanisms, but only with respect to such entity in its capacity or operation in such programs.

    E.    Exclusion U. **Wrongful Employment Practices**, is deleted in its entirety and replaced as follows:

        U.    **Wrongful Employment Practices**

        based upon, directly or indirectly arising out of, or in any way involving employment practices which includes discrimination or termination of employment;

15. Section XV. NO ACTION AGAINST INSURER is deleted in its entirety and replaced with the following:

No action shall be taken against the Insurer unless, as a condition precedent thereto, the **Insured** shall have fully complied with all terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** or by written agreement of the **Insured**, the claimant and the Insurer. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded

GSL40221NY (6-13)
Page 9

Policy No: 425391280
Endorsement No: 4
Effective Date:

© CNA All Rights Reserved.

Exhibit A
Page 36

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOSEPH MERCOLA, D.O., as Trustee of the Joseph M. Mercola Declaration of Trust, JANET SELVIG, as Trustee of the Mercola Insurance Trust, and MERCOLA.COM HEALTH RESOURCES, LLC | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No.: 1:14-CV-8170 ) |
| MOSTAFA ABDOU, MARK ZIEBOLD, and THE KOENIG GROUP, LLC | ) **JURY DEMAND** ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs JOSEPH MERCOLA, D.O. ("Dr. Mercola"), as Trustee of the Joseph M. Mercola Declaration of Trust, JANET SELVIG, as Trustee of the Mercola Insurance Trust, and MERCOLA.COM HEALTH RESOURCES, LLC ("Mercola.com"), through their attorneys, Gozdecki, Del Giudice, Americus, Farkas & Brocato LLP, hereby complain of Defendants, MOSTAFA ABDOU ("Abdou"), MARK ZIEBOLD ("Ziebold"), and THE KOENIG GROUP, LLC, as follows:

## NATURE OF THE CASE

1.      This action arises from a complex insurance sales scheme known in the insurance industry as "premium financed life insurance."

2.      Defendant Abdou (Plaintiffs' insurance broker) and Defendant Ziebold (Plaintiffs' attorney) induced Plaintiffs to purchase excessive amounts of life insurance from Minnesota Life Insurance Company ("Minnesota Life"), and to borrow excessive amounts of money from Northern Trust Corporation ("Northern Trust") to pay the premiums for those life insurance policies.  Defendants Abdou and Ziebold induced Plaintiffs to purchase this excessive

life insurance by promising, among other things, that Plaintiffs could secure the life insurance without incurring any out-of-pocket costs, and without having to pledge additional collateral (other than an initial deposit and the policies themselves).

3.      In an effort to induce Plaintiffs to borrow the funds and purchase the life insurance, Defendants Abdou and Ziebold, in violation of their professional and fiduciary duties to Plaintiffs, made material misrepresentations and failed to disclose material information to Plaintiffs.

4.      As a direct and proximate result of Defendants' fraudulent and otherwise wrongful conduct, Plaintiffs entered into the premium financed life insurance arrangement.

5.      By inducing Plaintiffs to enter into the premium financed life insurance arrangement, Defendants made substantial sums of money from brokerage commissions and attorney's fees.

6.      Years after Plaintiffs borrowed the funds from Northern Trust and purchased the life insurance policies from Minnesota Life, it became apparent that the representations made by Defendants were false, that Defendants had failed to disclose important information to Plaintiffs, and that Plaintiffs had been victimized by the wrongful conduct of Defendants.  Had Plaintiffs been properly advised, and had Defendants not made material misrepresentations and omissions, Plaintiffs would not have entered into the premium financed life insurance arrangement.

7.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs lost more than $3,000,000.00. Plaintiffs seek, among other things, compensatory and punitive damages.

## **PARTIES**

8.      Dr. Mercola is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois.  Dr. Mercola is a doctor of osteopathic medicine (D.O.) and is one of the leading

natural health practitioners in the United States.  Dr. Mercola is the trustee of the Joseph M. Mercola Declaration of Trust.

9.      Janet Selvig, Dr. Mercola's sister, is an individual who is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois.  Janet Selvig is the trustee of the Mercola Insurance Trust.  In her capacity as trustee of the Mercola Insurance Trust, Janet Selvig acted at the direction of Dr. Mercola.

10.     Mercola.com is a Delaware limited liability company with its principal place of business in Illinois.  Mercola.com is owned 99% by Dr. Mercola and 1% by Janet Selvig, and thus Mercola.com is a citizen of the State of Illinois.  Dr. Mercola is the principal manager of Mercola.com.

11.     Defendant Abdou is, and at all relevant times has been, a domiciliary and citizen of the State of California.  Abdou is an insurance broker who sells insurance for various insurance companies, including Minnesota Life.

12.     Defendant Ziebold is, and at all relevant times has been, a domiciliary and citizen of the State of California.  Ziebold is an attorney who resides and practices in California.

13.     Defendant The Koenig Group, LLC ("Koenig") is a Maryland limited liability company.   On information and belief, its members are all citizens of Maryland, and thus Koenig is a citizen of Maryland. Koenig provides financial planning and insurance services to high net worth individuals.  Koenig is, and at all relevant times was, Abdou's employer.

**<u>JURISDICTION AND VENUE</u>**

14.     This Court has diversity of citizenship jurisdiction under 28 U.S.C. §1332(a)(1), because the present matter is a civil action where the matter is controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391, because a substantial part of the actions and transactions at issue occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

16.     In 2009, Dr. Mercola was interested in updating his estate plan, and in particular taking steps to provide for asset protection, business succession, and charitable giving upon his death.

17.     In achieving his estate planning goals, Dr. Mercola further desired to avoid high-risk investments and large commitments of capital.

18.     On or about December 8, 2009, Dr. Mercola had a teleconference with his financial advisor at the time, Garrett Gunderson ("Gunderson"), during which Dr. Mercola notified Gunderson of his estate planning goals and investment parameters.  After being informed of Dr. Mercola's goals, Gunderson advised Dr. Mercola to consult with Abdou—an insurance broker who worked for Koenig—regarding the potential for a premium financed life insurance arrangement.

19.     On or about December 24, 2009, Dr. Mercola spoke with Abdou over the phone for the first time. During the call, Dr. Mercola informed Abdou of his estate planning goals, his desire to avoid high-risk investments and his desire to avoid large commitments of capital. During the call, Abdou represented to Dr. Mercola that Dr. Mercola was the perfect candidate for premium financed life insurance because such a product would allow Dr. Mercola to secure a substantial amount of life insurance with no out-of-pocket expense other than posting an initial cash deposit along with pledging the policies as collateral for the premium loans, and that premium financed life insurance would accomplish all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals.  As a result of Abdou's

representations during this call, Dr. Mercola continued to seek insurance advice from Abdou and Koenig.

20.    On January 7, 2010, Dr. Mercola spoke again with Abdou over the phone.  Abdou introduced attorney Ziebold, who was also on the call.   Abdou urged Dr. Mercola to retain Ziebold as his attorney.  Abdou advised Dr. Mercola that Ziebold was familiar with premium financed life insurance arrangements, and that he was an excellent estate planning attorney.  Abdou advised Dr. Mercola that Ziebold could review the premium financed life insurance structure, review the loan documents in connection with borrowing funds from a bank, and could provide excellent legal representation regarding Dr. Mercola's estate plan and business succession plan.  On or about January 7, 2010, at Abdou's urging, Dr. Mercola retained Ziebold to represent him in connection with the proposed premium financed life insurance arrangement and in planning his estate.  Dr. Mercola informed Ziebold of his estate planning, asset protection, business succession and charitable giving goals, his desire to avoid high-risk investments, and his desire to avoid large commitments of capital.

21.    Dr. Mercola spoke with Abdou and Ziebold several more times in early 2010. For example:

    a.   Dr. Mercola spoke with Abdou and Ziebold over the phone on January 26, 2010.

    b.   Dr. Mercola spoke with Abdou and Ziebold over the phone on February 19, 2010.

    c.   Dr. Mercola spoke over the phone with Abdou and Steve Rye (a key employee of Dr. Mercola) on February 11, 2010.

    d.   Dr. Mercola spoke with Abdou over the phone on March 20, 2010.

    e.   Dr. Mercola spoke with Abdou over the phone on May 17, 2010.

    f.   Dr. Mercola spoke with Abdou over the phone on May 31, 2010.

     g.   Dr. Mercola met with Abdou and Rebecca Ryan (a Senior Vice President at Northern Trust responsible for premium financed life insurance lending arrangements) at Dr. Mercola's office on May 27, 2010.

     h.   On June 9, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye and Amy Legaspi, one of Dr. Mercola's employees.

     i.   On June 28, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye, Amy Legaspi, and Chris Portera, Dr. Mercola's tax accountant.

22.     During the teleconferences and meeting, Abdou continued to represent to Dr. Mercola that premium financed life insurance was "perfect" for Dr. Mercola, and told Dr. Mercola that premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals.

23.     During the teleconferences and meeting, Abdou explained to Dr. Mercola that premium financed life insurance would allow him to secure a large amount of life insurance by using a bank's money to pay the life insurance premiums, and that there would be no out-of-pocket expenses. Abdou represented that the only collateral required for the loans would be the policies themselves plus an initial cash deposit. Abdou also represented that the premiums paid for the life insurance would accumulate value in the policies, and that such accumulated values in the policies could be invested in the stock market or in a fixed yield account. Abdou further represented that the accumulated values would earn returns that would both cover the loan interest and eventually repay the loan principal. Abdou advised Dr. Mercola to acquire the life insurance policies from Minnesota Life and to borrow the funds to pay the insurance premiums from Northern Trust.

24.     At all times in 2009 and 2010, Dr. Mercola informed Abdou that he was only interested in a conservative, low-risk investment that would achieve his estate planning, asset protection, business succession, and charitable giving goals. To that end, Dr. Mercola informed Abdou that he did not want his premium payments invested in the stock market. Instead, Dr.

Mercola wanted the money invested in a fixed yield account, a conservative investment which would generate the same rate of return each year, regardless of the performance of the market. Abdou stated that investing the premium payments in a fixed yield account would be perfect for the proposed premium financed life insurance arrangement, because the return from the fixed yield account would be greater than or equal to the required interest payments on the loan from Northern Trust.

25.     At all times in 2009 and 2010, Abdou stressed that premium financed life insurance was a suitable strategy for all of Dr. Mercola's goals. At no time did Abdou discuss other insurance options for Dr. Mercola. Moreover, Abdou presented no other financial products or potential solutions, and Abdou presented no policy value options other than securing the maximum dollar amount Minnesota Life would underwrite. At no time did Abdou ask Dr. Mercola whether he had the cash on hand to secure the life insurance without borrowing funds. Abdou never asked whether Dr. Mercola had alternative uses for his cash that would justify the strategy of borrowing money to pay the premiums, rather than paying the premiums himself.

26.     At no time did Abdou disclose to Dr. Mercola any risks associated with the premium financed life insurance arrangement. In fact, Abdou did just the opposite: he repeatedly guaranteeing the suitability, lack of risk, and "bullet proof" nature of the premium financed life insurance arrangement.

27.     On information and belief, Abdou and Ziebold had entered into an arrangement pursuant to which Abdou shared with Ziebold the commissions earned from the sale of life insurance to Plaintiffs. This arrangement was never disclosed to Dr. Mercola by Abdou or Ziebold.

28.     Also on information and belief, Abdou and Ziebold have an arrangement, whereby Abdou recommends Ziebold to his clients who are purchasing large premium financing

life insurance, in order to help close the life insurance sale and promote the premium financing life insurance arrangement.

29. On information and belief, the team of Abdou and Ziebold worked together on numerous occasions over many years to support each other in selling premium financed life insurance to other high net worth individuals.

30. Neither Abdou nor Ziebold ever disclosed that they work together on numerous premium financed life insurance arrangements each year, with Abdou selling the premium financing life insurance arrangement, and Ziebold blessing the premium financing structure. Upon information and belief, Abdou referred clients to Ziebold because he knew Ziebold, a supposedly independent legal advisor, would recommend the premium financed life insurance arrangement, regardless of whether it was in the client's best interest. Ziebold never disclosed that his representation was conflicted due to his relationship with Abdou, or that he always recommended premium financed life insurance arrangements to clients referred to him by Abdou.

31. On July 26, 2010, Abdou presented Dr. Mercola with purported policy illustrations that explained how the proposed premium financing arrangement would allegedly work. According to Abdou's illustrations, Dr. Mercola would not be required to spend money out of pocket to support the loan. The illustrations were flawed and deliberately deceptive in a number of ways. For example:

   a. The illustrations failed to disclose that the insurance policies would incur policy charges of approximately $68,000 each month, and failed to account for such charges in the value projections.

   b. The illustrations failed to accurately reflect the rate of return generated by the policies. Specifically, although the fixed rate of return for invested premiums on the policies was 3%, the illustrations used a fixed rate of return of 5%.

    c.    The illustrations failed to identify the amount of collateral that would be required to support the loans used to pay the premiums.

32.    Based in part on the flawed policy illustrations, on the representations and omissions of Abdou and Ziebold, and the blessing and promotion of the arrangement by Ziebold, Dr. Mercola agreed to participate in the premium financed life insurance arrangement proposed by Abdou. Specifically, Plaintiffs obtained the following Minnesota Life policies:

| Policy Date | Policy Number | Insured | Beneficiary | Coverage |
|---|---|---|---|---|
| 08/01/2010 | 2-513-132W | Joseph M. Mercola | Joseph M. Mercola Declaration of Trust | $50M |
| 09/24/2010 | 2-518-809W | Joseph M. Mercola | Mercola.com Health Resources LLC | $14M |
| 10/01/2010 | 2-518-762W | Joseph M. Mercola | The Mercola Insurance Trust | $21M |
| 11/19/2010 | 2-525-244W | Steven Andrew Rye | Mercola.com Health Resources LLC | $15M |

33.    The annual premiums for these four policies totaled $5,846,694.42.

34.    Abdou also introduced Dr. Mercola to Rebecca Ryan, who was at that time a Senior Vice President of Northern Trust. Abdou recommended that Northern Trust be the lender for the premium financed life insurance arrangement. During their meeting on May 27, 2010, Ryan represented to Dr. Mercola that the collateral requirements for his loans would be minimal.

35.    Ryan represented to Dr. Mercola that in order to secure the loans, Dr. Mercola would be required to assign the life insurance policies to Northern Trust as collateral. Northern Trust also required Dr. Mercola to post cash collateral in the amount of $550,000.

36.    Dr. Mercola was concerned about posting such substantial collateral. In the spring and summer of 2010, Abdou and Ziebold reassured Dr. Mercola that beyond the initial $550,000, no additional collateral would be needed because the fixed 3% returns generated by the policies would be sufficient to cover the fixed 3% interest rate on the loans, and thus the

assignment of the policies plus the $550,000 cash collateral would be sufficient security for the loans.

37.     At the urging of Abdou and Ziebold, Dr. Mercola arranged to finance the policy premiums with loans from Northern Trust.

38.     In reliance on the misrepresentations and omissions of Abdou and Ziebold, the Plaintiffs acquired the four Minnesota Life policies, financed by loans from Northern Trust.

39.     In July 2011, contrary to Abdou and Ziebold's prior representations, Northern Trust required Dr. Mercola to post an additional $530,000 cash collateral.  Northern Trust represented that if Dr. Mercola did not post the additional collateral, Northern Trust would not advance the funds necessary to pay the second year's insurance premiums.

40.     The requirement for the additional collateral in July 2011 was primarily driven by two factors:  (a) the interest charged for the loans was being added to the loan balance, thereby increasing the principal amount of the loan, and (b) Northern Trust was only using 95% of the surrender value of each policy as collateral, as opposed to the full surrender value.

41.     For the same reasons, in September 2011, in addition to the $530,000 additional cash collateral posted in July 2011 for policy 2-513-132W, Dr. Mercola was required to post an additional $194,000 cash collateral (for policies 2-518-809W, 2-518-762W and 2-525-244W).

42.     Dr. Mercola was shocked and concerned at Northern Trust's demands.  Neither Abdou nor Ziebold ever told Dr. Mercola that the interest charged for the loan would be added to the loan balance, or that doing so would cause Northern Trust to require additional collateral. Prior to July 2011, neither Abdou nor Ziebold ever told Dr. Mercola that only 95% of the surrender value of the policies would be used as collateral for the premium loans.

43.     Furthermore, neither Abdou nor Ziebold ever advised Dr. Mercola that any additional collateral could be required to extend the loans necessary to continue the financing

arrangement. In fact, Abdou and Ziebold continually represented that no additional collateral would ever be required.

44. Rather than permit the policies to lapse, Dr. Mercola posted the additional collateral, extended the loans, and paid the second year's premiums for the four policies to Minnesota Life.

45. Abdou recognized that Dr. Mercola was very upset with the misrepresentations Abdou and Ziebold had made and the fact that Dr Mercola was required to post substantial additional collateral. Thus, in 2012, Abdou informed Dr. Mercola that he had been able to negotiate the Northern Trust loan interest rate down from 3% to 2%.

46. Dr. Mercola, concerned about the increasing loan balance and collateral requirements, decided to pay the interest directly instead of having the interest accumulate as part of the loan balance. As a result, Dr. Mercola made the following interest payments to Northern Trust:

      a. December 31, 2012: $143,844.46;

      b. June 28, 2013: $181,981.24; and

      c. January 17, 2014: $156,368.65.

47. On August 10, 2012, on behalf of Northern Trust, Ryan informed Dr. Mercola that no additional collateral was required to extend the loans necessary to fund the premiums for the four policies in 2012.

48. Dr. Mercola's loans were thus extended, and Northern Trust advanced the sums to pay the third year's premiums for the four policies to Minnesota Life.

49. The following year, on September 25, 2013, on behalf of Northern Trust, Ryan sent an email to Dr. Mercola showing a collateral shortfall of $2.9 million. As a result of the shortfall, Ryan informed Dr. Mercola that he would need to post at least $2.9 million in

additional cash collateral in order to extend the loans and to keep the four life insurance policies in effect.

50.     The sudden increase in the collateral requirement was due to the expiration of a Surrender Value Enhancement Agreement that was a rider to each of the four policies.

51.     The Surrender Value Enhancement Agreement provided that, for the first three years of the policies, Dr. Mercola could surrender the policies at any point and receive a surrender value equal to the amount he had paid in premiums to that point in time.  Thus, for the first three years of the policies (until 2013), the surrender value of the four policies was higher than it otherwise would have been, and thus, Dr. Mercola did not have to post additional collateral.

52.     However, in 2013, when the Surrender Value Enhancement Agreement expired, the surrender value of the policies did not equal the amount Dr. Mercola had paid in premiums. Rather, the surrender value equaled only the accumulated value of the policies, less undisclosed surrender charges to that point.  Thus, the surrender value was significantly less than the total premiums Dr. Mercola had paid.  Unbeknownst to Dr. Mercola, policy charges (approximately $68,000 per month) were being deducted from the accumulated value in the policies.  Also, unbeknownst to Dr. Mercola, the surrender value of the policies was no longer protected by the Surrender Value Enhancement Agreement.  As a result, in 2013 the accumulated value in the policies was much lower than expected, and the collateral required by Northern Trust to support the loans increased dramatically.

53.     Neither Abdou nor Ziebold had ever informed Dr. Mercola that such large sums of collateral could be required by Northern Trust.  In fact, such a collateral requirement was contrary to the representations made by Abdou and Ziebold.  Had Dr. Mercola been aware of the

true arrangement and collateral requirements, he never would have entered into a premium financed life insurance arrangement.

54.     Neither Abdou nor Ziebold ever disclosed to Dr. Mercola that the Surrender Value Enhancement Agreement could not be renewed beyond the first three years.  Furthermore, neither Abdou nor Ziebold ever explained the effect the expiration of the Surrender Value Enhancement Agreement would have on Dr. Mercola's collateral until after the Surrender Value Enhancement Agreement had expired.

55.     Furthermore, on multiple occasions, including in an email dated October 1, 2013 (after the Surrender Value Enhancement Agreement had apparently already expired) Abdou assured Dr. Mercola that the Surrender Value Enhancement Agreement rider remained in effect, and would remain in effect.

56.     Neither Abdou nor Ziebold ever disclosed to Dr. Mercola the substantial monthly policy charges associated with the insurance policies, the fact that the policy charges decreased the accumulated value of the policies, or the effect such charges would have on the collateral requirements for the loans.

57.     Indeed, when Dr. Mercola inquired about the policy charges with Abdou in 2010, Abdou informed Dr. Mercola that such charges were minimal and were not to be worried about.

58.     On or about October 22, 2013, Abdou sent Dr. Mercola an email that disclosed, for the first time, the total collateral requirements for the loans.  Contrary to what Abdou and Ziebold had previously told Dr. Mercola, Abdou's email explained that Dr. Mercola would need to post millions of dollars of additional collateral each year, up to $8.4 million in additional collateral by 2016.

59.     Dr. Mercola never would have participated in the premium financed life insurance arrangement had he known the true policy costs and the true collateral requirements.

60.     On or around February 28, 2014, after learning of the previously concealed policy costs and collateral requirements, Dr. Mercola elected to surrender all four policies and repay the Northern Trust loans.  Dr. Mercola forfeited the $14,956,575.53 surrender value of the policies, the $1.3 million in cash collateral that he previously posted, and additional out-of-pocket sums.

61.     In total, Dr. Mercola, through his trusts and company, lost more than $3 million as a result of the premium financed life insurance arrangement.

## COUNT I: Breach of Fiduciary Duty
### (Plaintiffs v. Abdou and Koenig)

62.     Plaintiffs incorporate by reference paragraphs 1 through 61 as though fully restated herein.

63.     As Plaintiffs' insurance broker, Abdou, individually and on behalf of Koenig, owed Dr. Mercola and Plaintiffs certain fiduciary duties, including but not limited to a duty to: (a) advise Dr. Mercola of all available insurance options; (b) advise Dr. Mercola of all of his financial options to achieve his respective goals in accordance with his investment parameters; (c) determine the suitable insurance products based on Dr. Mercola's financial situation, goals, and desires; (d) fully disclose all material facts regarding the insurance products presented, including the advantages and risks associated therewith; (e) exercise reasonable skill and diligence in selecting policies for Dr. Mercola; and (f) not mislead Dr. Mercola.

64.     At all times when dealing with Dr. Mercola and Plaintiffs, Abdou acted within the scope of his employment at Koenig.

65.     Abdou, individually and on behalf of Koenig, breached his fiduciary duties by:

    a.    failing to advise Dr. Mercola of life insurance alternatives other than premium financed life insurance;

    b.    failing to provide life insurance quotes from any company other than Minnesota Life;

c.      failing to inquire as to whether Dr. Mercola had sufficient cash flow to pay life insurance premiums without the need to borrow funds, or whether Dr. Mercola had an alternative use for available funds (that would support borrowing the funds from a bank);

d.      failing to analyze whether any available level of life insurance coverage other than the maximum amount was appropriate for Dr. Mercola;

e.      failing to advise Dr. Mercola as to the proper amount of life insurance needed to meet his estate planning, asset protection, business succession and charitable giving  goals;

f.      failing to disclose the policy costs associated with the Minnesota Life policies that Abdou recommended;

g.      failing to disclose the full collateral requirements associated with premium financed life insurance arrangement that Abdou recommended;

h.      failing to monitor the performance of the policies and advise Dr. Mercola of the additional collateral that would be required;

i.      advising Dr. Mercola to purchase life insurance policies with significantly higher death benefits than were necessary or prudent for Dr. Mercola's needs, in order to increase the commissions payable to Abdou;

j.      failing to advise Dr. Mercola that the insurance policies would never become self-financing if the accumulated policy value was placed in a 3% fixed yield account;

k.      failing to disclose that the Surrender Value Enhancement Agreement was only in effect for three years, and would not be renewable beyond the first three years;

l.      failing to disclose the effect of the Surrender Value Enhancement Agreement's expiration on Dr. Mercola's collateral position;

m.      misrepresenting to Dr. Mercola that no additional out-of-pocket expense would be required beyond an initial collateral deposit and the policies themselves;

n.      misrepresenting to Dr. Mercola that the Surrender Value Enhancement Agreement was renewable, and thus the surrender value of the policies would always equal or exceed the cumulative premiums paid into the policies;

o.      misrepresenting to Dr. Mercola that the policy costs were "low" and "nothing to worry about"; and

p.      failing to otherwise properly advise Dr. Mercola.

66.     As a result of the foregoing breaches of fiduciary duties, Plaintiffs were damaged in excess of $3 million.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou and Koenig as follows:

a.     finding that Abdou, individually and on behalf of Koenig, breached his fiduciary duties;

b.     awarding Plaintiffs the damages suffered as a consequence of the breach of fiduciary duties, in an amount not less than $3,000,000, jointly and severally against Abdou and Koenig, the exact amount of which will be proven at trial;

c.     requiring Abdou and Koenig to disgorge all commissions earned in connection with the sale of premium financed life insurance policies to Plaintiffs;

d.     imposing a punitive damage award against Abdou and Koenig;

e.     awarding Plaintiffs the costs of this action; and

f.     awarding such other and further relief as the Court deems just.

**<u>COUNT II: Legal Malpractice</u>**
**<u>(Plaintiffs v. Ziebold)</u>**

67.     Plaintiffs incorporate by reference paragraphs 1 through 66 as though fully restated herein.

68.     Defendant Ziebold was retained to analyze and implement a comprehensive estate plan for Dr. Mercola, including an independent review of the premium financing life insurance arrangement proposed by Abdou.  As Dr. Mercola's attorney, Ziebold owed Dr. Mercola fiduciary duties of the highest order.

69.     When Dr. Mercola retained Ziebold to perform estate planning services, Dr. Mercola identified several goals that he wanted his estate plan to achieve.

70.     Dr. Mercola explained to Ziebold that he wanted to establish a structure to protect his assets from potential creditors.

71.     In addition, Dr. Mercola explained to Ziebold that he wanted to pass along management control of Mercola.com to his key employees.

72.     Dr. Mercola also explained to Ziebold that he wanted to ensure that the bulk of his assets would pass to a charity of his choosing, with minimum tax consequences.

73.     The course of action recommended by Ziebold met none of Dr. Mercola's objectives.  Ziebold, exploiting his position as Dr. Mercola's attorney, fraudulently induced Dr. Mercola to obtain the premium financed life insurance endorsed by Abdou and Ziebold.  Ziebold falsely advised Dr. Mercola that premium financed life insurance was a "no-brainer," that it had no risks, and that it would meet all of his estate planning goals.  Ziebold's intent was to bless the premium financed life insurance scheme for Abdou's and Ziebold's benefit.  In violation of his fiduciary duties, Ziebold advised Dr. Mercola to enter into an arrangement that benefited Abdou and Ziebold at Dr. Mercola's expense.

74.     On information and belief, Ziebold urged Dr. Mercola to obtain premium financed life insurance because Abdou refers many clients to Ziebold, and Ziebold knew that in order to retain Abdou as a referral source, Ziebold had to recommend the premium financed life insurance arrangement to Dr. Mercola and implement all the legal work necessary to close the premium financed life insurance sale.

75.     Also, on information and belief, Ziebold urged Dr. Mercola to obtain premium financed life insurance because he shared in the commissions generated by the sale of such policies.

76.     Premium financed life insurance was entirely unsuitable for a client with Dr. Mercola's estate planning, asset protection, business succession and charitable giving objectives.

It was also unsuitable for a client who wished to (a) invest conservatively in fixed income products, and (b) avoid large commitments of capital.

77.     For example, Ziebold (who is not licensed in Illinois) guaranteed that the values of the life insurance policies were completely protected from creditors.  However, this was not the case under the applicable Illinois statute.

78.     Furthermore, the excessive dollar amount of life insurance purchased through the premium financing scheme, which was encouraged and approved by Ziebold, had no specific purpose in Dr. Mercola's estate plan.  Rather, the amount of coverage secured was simply the maximum amount that Minnesota Life would underwrite, and thus the amount that would generate the largest premiums and commissions for Abdou and Ziebold.

79.     Other portions of the estate plan Ziebold implemented were flawed or non-existent.  For example, Dr. Mercola wanted the management of Mercola.com to be transferred to his key employees after his death.  No such succession plan was implemented.

80.     The estate plan Ziebold set up would have transferred most of Dr. Mercola's assets (including Mercola.com) to Dr. Mercola's private charitable foundation upon his death.  Ziebold, however, never advised Dr. Mercola of the extreme adverse tax consequences of a private charitable foundation owning a majority interest in a valuable operating business such as Mercola.com.

81.     As an estate planning attorney, Ziebold knew or should have known of the flaws in the overall estate plan he implemented on Dr. Mercola's behalf, as well as the inherent flaws in the premium financed life insurance portion of the estate plan.  Nevertheless, Ziebold recommended that Dr. Mercola pursue the premium financed life insurance.

82.     Ziebold performed no comprehensive estate planning.  In addition, any estate planning Ziebold implemented was fundamentally flawed and had to be redone by new estate planning counsel.

83.     Ziebold breached the standard of care an attorney owes to his client and committed legal malpractice by:

a.      failing to appropriately structure Dr. Mercola's estate plan;

b.      implementing an estate plan that upon Dr. Mercola's death would have led to severe adverse tax consequences if Dr. Mercola's controlling interest in Mercola.com was transferred to Dr. Mercola's private foundation.

c.      failing to disclose his conflict of interest generated by his relationship with Abdou;

d.      failing to disclose that he and Abdou had worked on and implemented numerous premium financed life insurance arrangements together and that he has a clear interest and bias to this type of planning;

e.      inducing Dr. Mercola to implement a strategy that was detrimental to his interests, but which resulted in substantial gain to Abdou and Ziebold;

f.      improperly encouraging Dr. Mercola to purchase excessive amounts of premium financed life insurance;

g.      incorrectly advising Dr. Mercola that premium financed life insurance was a "bullet proof" asset protection strategy and the cash value of the policy was guaranteed to be protected;

h.      incorrectly advising Dr. Mercola that premium financed life insurance would achieve all of Dr. Mercola's stated estate planning, asset protection, business succession and charitable giving  objectives, when Ziebold knew or should have known that this was not true;

i.      failing to disclose the policy charges associated with the four Minnesota Life policies;

j.      failing to disclose the collateral requirements associated with the Northern Trust loans and the potential adverse effects related thereto;

k.      failing to advise that the Surrender Value Enhancement Agreement was only effective for three years;

l.      failing to advise that the Surrender Value Enhancement Agreement was potentially non-renewable;

m.      failing to advise Dr. Mercola of the effect that the Surrender Value Enhancement Agreement's expiration would have on his collateral position with Northern Trust; and

n.      otherwise failing to represent Dr. Mercola.

84.      As a result of Ziebold's breaches of his fiduciary duty and legal malpractice, Dr. Mercola was forced to obtain new estate planning counsel and incur costs to correct his estate planning. Through his trusts and his company, Mercola.com, Dr. Mercola was damaged in excess of $3 million.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Ziebold:

a.      finding that Ziebold committed legal malpractice;

b.      awarding Plaintiffs the damages suffered as a consequence of the legal malpractice, in an amount not less than $3,000,000, the exact amount of which will be proven at trial;

c.      requiring Ziebold to disgorge all fees he received from Plaintiffs;

d.      awarding Plaintiffs an amount equal to the attorneys' fees they incurred to correct Ziebold's negligent work;

e.      awarding Plaintiffs the costs of this action; and

f.      awarding such other and further relief the Court deems just.

### <u>COUNT III: Fraud</u>
### (Plaintiffs v. Abdou)

85.      Plaintiffs incorporate by reference paragraphs 1 through 84 as though fully restated herein.

86.     Abdou is an insurance broker specializing in the sale of premium financed life insurance.

87.     Life insurance brokers are typically compensated by receiving a large portion of the first year's premiums as a commission.  Because the premiums are determined in part by the face amount of the life insurance, brokers such as Abdou have a strong financial incentive to sell life insurance policies with a high face amount.

88.     Premium financed life insurance is a product that allows an insured to acquire a life insurance policy with a higher face amount than might otherwise be available.  It is also a product that allows a broker to reap a significantly larger commission if the insured can be persuaded to obtain premium financed life insurance.

89.     In his 2009 and 2010 meetings with Dr. Mercola (*see supra* ¶¶ 19-26), Abdou induced Dr. Mercola, on behalf of Plaintiffs, to obtain premium financed life insurance, despite such insurance not being suitable for a person with Dr. Mercola's stated estate planning goals and investment parameters.  Furthermore, there was no reason for the exorbitant amount of life insurance Abdou recommended, other than that it was the maximum amount of coverage that Minnesota life would offer Dr. Mercola, it had the highest possible premium, and thus, it maximized the commissions that Abdou would receive.

90.     In inducing Dr. Mercola to obtain premium financed life insurance, Abdou made several misrepresentations, all of which he knew were false at the time he made them.

91.     Specifically, during meetings with Dr. Mercola during 2009 and 2010, Abdou made the following misrepresentations:

| Abdou Misrepresentations | Actual Facts |
|---|---|
| The policy charges would be "low" and "nothing to worry about." | The policy charges were not "low." In fact, the policy charges were approximately $68,000 *per month*. |
| Premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals. | Premium financed life insurance did not meet any of Dr. Mercola's goals for estate planning, asset protection, business succession or charitable giving. |
| The policies would become self-funding, as the earnings on the accumulated value in the policies would be more than sufficient to cover the costs associated with the financing. | The policies would not become self-funding with the fixed yield rate of return, because the earnings on the accumulated value of the policies would never generate sufficient returns to cover the policy charges and the loan interest. |
| The premium financed life insurance arrangement was a tax efficient planning tool; | The insurance policies were a poor vehicle for distributing funds to charity, as the structure recommended by Abdou and Ziebold would have resulted in significant negative tax consequences at the time of Dr. Mercola's death. |
| The policies would provide significant asset protection. | The policies did not provide significant asset protection, because under Illinois law both the insurance policies themselves and the collateral posted by Dr. Mercola were accessible to creditors. |
| The Surrender Value Enhancement Agreement rider on the policies could be renewed. | The Surrender Value Enhancement Agreement was not renewable after three years, and the expiration of that Agreement would trigger significant demands for additional collateral. |
| Dr. Mercola would not need to post additional collateral to maintain the Northern Trust loans, because the surrender value of the policies would be sufficient collateral. | Dr. Mercola would need to post substantial amounts of additional collateral to maintain the loans, because as a result of undisclosed policy charges the surrender value of the insurance policies was significantly lower. |

| Abdou Misrepresentations | Actual Facts |
|---|---|
| Abdou would not receive any commissions on the policies unless Dr. Mercola maintained the policies for a period of several years. | Abdou received substantial commissions up front when the policies were purchased. |
| The policy illustrations (written instruments purportedly designed to illustrate how the life insurance policies would accumulate value over time) Abdou provided to Dr. Mercola on July 26, 2010 were accurate illustrations of how Dr. Mercola's life insurance policies would function and perform. | The illustrations failed to disclose that the insurance policies would incur charges of approximately $68,000 each month, failed to account for such charges in the projections, used a 5% fixed rate of return rather than a 3% fixed rate of return, and failed to set forth the amount of collateral that would be required to support the loans used to pay the premiums. |

92.    As an insurance broker specializing in premium financed life insurance, Abdou knew that all of the aforementioned representations were false at the time they were made.

93.    Abdou never disclosed to Dr. Mercola his relationship with Ziebold, Ryan, and Northern Trust—the team of advisors that Abdou consistently used to close numerous premium financed life insurance sales.

94.    Abdou made all of the aforementioned misrepresentations with the intention of preying on and inducing Dr. Mercola to purchase premium financed life insurance with high face amounts.  These purchases resulted in substantial commissions to Abdou.

95.    Dr. Mercola relied to his detriment on Abdou's aforementioned misrepresentations, by causing Plaintiffs to enter into a premium financed life insurance arrangement.

96.    Dr. Mercola and Plaintiffs never would have participated in the premium financed life insurance arrangement but for Abdou's misrepresentations.  Premium financed life insurance did not meet any of Dr. Mercola's estate planning, asset protection, business succession or

charitable giving goals.  Furthermore, premium financed life insurance did not comport with Dr.

Mercola's stated investment parameters, because it would have required high-risk investments in

order to offset the significant policy costs, and because it required large outlays of capital for

collateral.

97.     The sole reason Dr. Mercola and Plaintiffs participated in premium financed life

insurance was because Dr. Mercola believed, based on Abdou's and Ziebold's

misrepresentations, that premium financed life insurance was a suitable product for someone

with Dr. Mercola's specific estate planning goals and investment parameters.

98.     Dr. Mercola's reliance on Abdou was reasonable, because Abdou was Dr.

Mercola's insurance broker and because Abdou stood in a fiduciary relationship with Dr.

Mercola and Plaintiffs.

99.     Plaintiffs suffered damages in excess of $3 million as a result of the premium

financed life insurance arrangement he was fraudulently induced to enter by Abdou.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration

of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health

Resources, LLC, respectfully request that this Court enter judgment in their favor and against

Abdou:

a.     finding that Abdou committed fraud;

b.     awarding Plaintiffs the damages suffered as a consequence of the fraud, in
       an amount not less than $3,000,000, the exact amount of which will be
       proven at trial;

c.     imposing a punitive damage award against Abdou;

d.     requiring Abdou and Koenig to disgorge all commissions earned in
       connection with the sale of premium financed life insurance policies to
       Plaintiffs;

e.      awarding Plaintiffs the costs of this action; and

f.      awarding such other and further relief the Court deems just.

## COUNT IV: Consumer Fraud
### (Plaintiffs v. Abdou)

100.    Plaintiffs incorporate by reference paragraphs 1 through 99 as though fully restated herein.

101.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*., prohibits, *inter alia*, deceptive acts or practices in the conduct of any trade or commerce.

102.    As an insurance broker, Abdou engaged in trade and commerce in Illinois in 2009 and 2010.

103.    In conducting trade and commerce, Abdou engaged in deceptive practices when he sold four Minnesota Life insurance policies to Dr. Mercola and Plaintiffs.

104.    Specifically, Abdou repeatedly told Dr. Mercola that:

a.      the policy charges would be "low" and "nothing to worry about";

b.      premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals;

c.      the policies would become self-funding, as the earnings on the accumulated value in the policies would be more than sufficient to cover the costs associated with the financing;

d.      the premium financed life insurance arrangement was a tax efficient planning tool;

e.      the policies would provide significant asset protection;

f.      the Surrender Value Enhancement Agreement rider on the policies could be renewed, ensuring that Dr. Mercola would not be at risk for losses as a result of the insurance policies;

g.      Dr. Mercola would not need to post additional collateral to maintain the premium loans, because the surrender value of the policies would be sufficient collateral;

h.      Abdou would not receive any commissions on the policies unless Dr. Mercola maintained the policies for a period of several years; and

i.      that the policy illustrations (written instruments purportedly designed to illustrate how the life insurance policies would accumulate value over time) Abdou provided to Dr. Mercola on July 26, 2010 were accurate illustrations of how Dr. Mercola's life insurance policies would work.

105.    Abdou made these misrepresentations to induce Dr. Mercola to purchase the four Minnesota Life insurance policies on behalf of Plaintiffs, which resulted in substantial commissions to Abdou.

106.    Dr. Mercola and Plaintiffs relied to their detriment on Abdou's misrepresentations, and purchased the four Minnesota Life insurance policies using premium financing.

107.    Plaintiffs suffered damages in excess of $3 million as a result of the premium financed life insurance arrangement Dr. Mercola was fraudulently induced to enter by Abdou.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou:

a.      finding that Abdou committed consumer fraud in violation of the Act;

b.      awarding Plaintiffs the damages suffered as a consequence of the fraud, in an amount not less than $3,000,000, the exact amount of which will be proven at trial;

c.      imposing a punitive damage award against Abdou;

d.      awarding Plaintiffs reasonable attorneys' fees;

e.      awarding Plaintiffs the costs of this action; and

f.      awarding such other and further relief the Court deems just.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

> Joseph Mercola, D.O., as Trustee of the Joseph M. Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Sources, LLC

> BY:    /s/David S. Americus         
> One of Plaintiffs' attorneys

> David S. Americus (d.americus@gozdel.com)
> Peter J. Wozniak (p.wozniak@gozdel.com)
> Steven H. Leech (s.leech@gozdel.com)
> **Gozdecki, Del Giudice, Americus, Farkas & Brocato LLP**
> One East Wacker Drive
> Suite 1700
> Chicago, IL  60601
> (312) 782-5010 (tel.)
> (312) 782-4324 (fax)

JS 44 (Rev. 3/13)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Joseph Mercola, D.O. | Mostafa Abdou, Mark Ziebold, and The Koenig Group, LLC |
| **(b)** County of Residence of First Listed Plaintiff    Cook County<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant    San Diego County<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Gozdecki, Del Giudice, Americus, Farkas & Brocato LLP | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- 1   U.S. Government Plaintiff
- 2   U.S. Government Defendant
- 3   Federal Question *(U.S. Government Not a Party)*
- ✔ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ✔ 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | ✔ 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| | | | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities Employment<br>☐ 446 Amer. w/Disabilities Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ✔ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

Diversity Breach of Fiduciary Duty, 28 U.S.C. 1332

## VII. Previous Bankruptcy Matters
(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   $3,000,000

CHECK YES only if demanded in complaint:

JURY DEMAND:   ✔ Yes   ☐ No

## IX. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE     DOCKET NUMBER

## X. This case (check one box) ☐ Is not a refiling of a previously dismissed action ☐ is a refiling of case number _____ previously dismissed by Judge _____

DATE   October 17, 2014     SIGNATURE OF ATTORNEY OF RECORD   /s/David S. Americus

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

        (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

        (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III.     **Residence (citizenship) of Principal Parties**. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      **Origin**. Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

VI.     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.     **Previous Bankruptcy Matters** For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

VIII.     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

IX.     **Related Cases**. This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

X.      **Refiling Information**. Place an "X" in one of the two boxes indicating if the case is or is not a refiling of a previously dismissed action. If it is a refiling of a previously dismissed action, insert the case number and judge.

        **Date and Attorney Signature**. Date and sign the civil cover sheet.

Rev040913

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOSEPH MERCOLA, D.O., as Trustee of the<br>Joseph M. Mercola Declaration of Trust,<br>JANET SELVIG, as Trustee of the Mercola<br>Insurance Trust, and MERCOLA.COM<br>HEALTH RESOURCES, LLC<br><br>Plaintiffs,<br><br>v.<br><br>MOSTAFA ABDOU, MARK ZIEBOLD, and<br>THE KOENIG GROUP, LLC<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.:<br><br>)    **JURY DEMAND** |

**MERCOLA.COM HEALTH RESOURCES, LLC's
LOCAL RULE 3.2 NOTIFICATION OF AFFILIATES**

Plaintiff MERCOLA.COM HEALTH RESOURCES, LLC, pursuant to Local Rule 3.2,

hereby states that it is a nongovernmental party that has no publicly held affiliates.


BY:    /s/David S. Americus
          One of Plaintiffs' attorneys

          David S. Americus (d.americus@gozdel.com)
          Peter J. Wozniak (p.wozniak@gozdel.com)
          Steven H. Leech (s.leech@gozdel.com)
          **Gozdecki, Del Giudice, Americus,**
          **Farkas & Brocato LLP**
          One East Wacker Drive
          Suite 1700
          Chicago, IL 60601
          (312) 782-5010 (tel.)
          (312) 782-4324 (fax)

EXHIBIT "C"

Exhibit C
Page 68



Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Mary E. Borja
202.719.4252
mborja@wileyrein.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7030
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

November 24, 2014

**VIA EMAIL & CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

Joseph M. Aliberti, Esq.
Law Offices Joseph M. Aliberti
260 Newport Center Drive, Suite 100,
Newport Beach, Ca. 92660

| Re: | Insured: | The Financial Sales Professionals Purchasing Group |
|---|---|---|
| | Policy No.: | 425391280 |
| | Policy Period: | July 1, 2014 – July 1, 2015 |
| | Claimants: | Joseph Mercola, D.O., Janet Selvig, Mercola.com Health Resources, LLC |
| | File. No. | IAA01415 |

Dear Mr. Aliberti:

We have been retained by Columbia Casualty Company ("Columbia") with respect to the above-referenced matter. We understand that you are personal counsel for Mr. Mostafa Abdou ("Abdou"), and that you are the proper contact person for them with respect to coverage issues. If we are mistaken in that regard, we ask that you alert us immediately and advise us of the proper contact person with respect to coverage.

Columbia issued Life Agent Professional Liability Insurance Policy No. 425391280 to The Financial Sales Professionals Purchasing Group for the policy period of July 1, 2014 to July 1, 2015 (the "Policy"). The Policy has Limits of Liability of $2 million for each **Claim**[1] and $2 million in the aggregate for **Agents** or **General Agents** (who are not also covered as a **Registered Representative**), subject to a $1,000 each **Claim** retention for Insurance products sponsored by Companies identified in the Declarations Item 1a. or 1b. and a $2,000 each **Claim** retention for all **Outside Business**. The Limits of Liability available to each **Insured** are specified in the written records of The Financial Sales Professionals Purchasing Group.

---

[1] Items in bold are defined terms in the Policy. Please review this letter together with a copy of the Policy. If you need a copy of the Policy, please let us know.

Exhibit C
Page 69



Joseph M. Aliberti, Esq.
November 24, 2014
Page 2

On September 19, 2014, Abdou provided notice to Columbia of a **claim** against Abdou arising out of his sale of premium financed life insurance to a former client, Joseph Mercola, D.O. ("Dr. Mercola"). Notice was prompted by Abdou's receipt of a draft complaint against him from counsel for Dr. Mercola. On October 10, 2014, Abdou advised Columbia that he decided to withdraw his request for coverage for Dr. Mercola's **claim**. Thereafter, on October 17, 2014, Dr. Mercola, as Trustee of the Joseph M. Mercola Declaration of Trust; Janet Selvig, as Trustee of the Mercola Insurance Trust; and Mercola.com Health Resources, LLC (collectively, "the Mercola Plaintiffs") filed a complaint against Abdou, Mark Ziebold ("Ziebold"), and The Koenig Group, LLC ("Koenig"), styled *Mercola, et al. v. Abdou, et al.*, No. 1:14-DV-8170 (N.D. Ill.) (the "Mercola Claim").

Although it appears that Abdou withdrew his request for coverage under the Policy before suit was filed against him, in light of the filing of the lawsuit by the Mercola Plaintiffs, this letter provides Abdou with Columbia's evaluation of coverage under the Policy for the Mercola Claim. The views expressed in this letter necessarily are based on the limited information that is available to Columbia at this time, and thus are not intended to be exhaustive or exclusive. Please understand that, by analyzing coverage as it does, Columbia does not in any way suggest that it has concluded that any allegation in the Mercola Claim is true. For the reasons that follow, Columbia has determined that there is no coverage under the Policy for the Mercola Claim.

## I.   FACTUAL BACKGROUND

The Mercola Plaintiffs allege that Abdou acted as Dr. Mercola's insurance broker for the sale of premium financed life insurance. According to the complaint, in 2009, Dr. Mercola was interested in taking steps to provide for asset protection, business succession, and charitable giving. He spoke with his financial advisor, who advised him to consult with Abdou regarding the potential for a premium financed life insurance arrangement. The complaint alleges that, at all relevant times, Koenig was Abdou's employer.

The complaint alleges that Abdou advised Dr. Mercola to purchase premium financed life insurance policies from Minnesota Life and to borrow the funds to pay the premiums from Northern Trust. The complaint also alleges that Dr. Mercola retained Ziebold as his estate planning attorney at Abdou's urging.

Exhibit C
Page 70



Joseph M. Aliberti, Esq.
November 24, 2014
Page 3

According to the complaint, Abdou and Ziebold had entered into an arrangement pursuant to which Abdou shared with Ziebold the commissions earned from the sale of life insurance in exchange for Ziebold's cooperation and advice to help close the life insurance sale and promote the premium financing life insurance arrangement. According to the complaint, by inducing Dr. Mercola to enter into the premium financed life insurance arrangement, Abdou and the other defendants made substantial sums of money from brokerage commissions and attorneys' fees.

Although Abdou allegedly informed Dr. Mercola that he would not be required to spend money out of pocket to support the loans and that he would not have to pledge additional collateral for the premium loans (other than an initial deposit and the policies themselves), Dr. Mercola later learned that he was required to post increasing cash collateral amounts. Dr. Mercola posted additional collateral several times but, by September 25, 2013, Northern Trust informed Dr. Mercola that there was a collateral shortfall of $2.9 million.

The Mercola Plaintiffs assert that policy charges of approximately $68,000 per month were being deducted from the accumulated value in the life insurance policies and that the surrender value of the policies eventually was not protected. As a result, in 2013, the accumulated value in the policies was much lower than Dr. Mercola expected, and the collateral required by Northern Trust to support the loans increased dramatically.

The complaint alleges that, in October 2013, Abdou sent an email to Dr. Mercola that for the first time disclosed the total collateral requirements for the loans. In February 2014, Dr. Mercola elected to surrender the policies and repay the loans. According to the complaint, he forfeited the $14,956,575.53 surrender value of the policies and, the $1.3 million in previously posted cash collateral, and he incurred unspecified additional out-of-pocket costs. The complaint alleges that Dr. Mercola, through his trusts and company, lost more than $3 million as a result of the premium financed life insurance arrangement that Abdou brokered.

The complaint includes counts against Abdou and Koenig for breach of fiduciary duty and against Abdou alone for fraud and consumer fraud. The complaint also asserts a separate count against Ziebold for legal malpractice. The Mercola Plaintiffs seek no less than $3,000,000 in compensatory damages,

Exhibit C
Page 71



Joseph M. Aliberti, Esq.
November 24, 2014
Page 4

disgorgement of all commissions earned in connection with the sale of premium financed life insurance policies, punitive damages, and attorney's fees and costs.

## II.   COVERAGE ANALYSIS

Based on the information that currently is available, Columbia has concluded that two Policy exclusions each operate as a total bar to coverage for the Mercola Claim. In addition, other Policy provisions may bar or limit coverage, as explained below.

### A.   Premium Finance Exclusion

As a threshold issue, the Mercola Claim is barred from coverage by the Policy's Premium Finance Exclusion. The Policy states, in relevant part, that:

> The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:
>
> …
>
> based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, attempted sale or servicing of any:
>
> …
>
> 13. [ ] life insurance policy in which the premium was paid for, in whole or in part, by or through any premium finance mechanism or any premium finance company.

Policy, Section XIX, Exclusion L.13. (the "Premium Finance Exclusion"). As defined in the Policy, "**Loss**" includes "monetary settlements or monetary judgments (including any award of pre-judgment and post-judgment interest) and **Defense Costs** for which the **Insured** is legally obligated to pay on account of a covered **Claim**." Policy, Section III.

The Mercola Claim unequivocally states that "[t]his action arises from a complex insurance sales scheme known in the insurance industry as 'premium

Exhibit C
Page 72



Joseph M. Aliberti, Esq.
November 24, 2014
Page 5

financed life insurance.'" Compl., ¶ 1. Moreover, the Mercola Plaintiffs allege that "[a]s a direct and proximate result of Defendants' fraudulent and otherwise wrongful conduct, Plaintiffs entered into the premium financed life insurance arrangement." *Id.* ¶ 4. Thus, the Mercola Claim is "based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, attempted sale or servicing of any: ... life insurance policy in which the premium was paid for, in whole or in part, by or through any premium finance mechanism." Accordingly, the Policy's Premium Finance Exclusion bars all coverage for the Mercola Claim.

**B.**   **Premium Payment Guaranty Exclusion**

The Mercola Claim also is barred from coverage by the Policy's Premium Payment Guaranty Exclusion. The Policy states, in relevant part, that:

> The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:
>
> ...
>
> based upon, directly or indirectly arising out of, or in any way involving:
>
> ...
>
> 2. [the] making or stating of any promises or guarantees as to interest rates or fluctuations in interest rates, the market value of any investment or insurance product, or future premium payments[.]

Policy, Section XIX, Exclusion F.2. (the "Premium Payment Guaranty Exclusion").

The complaint alleges that Abdou informed Dr. Mercola that he would not be required to spend money out of pocket to support the premium loans and that he would not have to pledge additional collateral (other than an initial deposit and the policies themselves) in connection with the premium financing. Further, the Mercola Plaintiffs allege that, after Dr. Mercola posted the initial cash deposit,

Exhibit C
Page 73



Joseph M. Aliberti, Esq.
November 24, 2014
Page 6

Abdou and Ziebold assured Dr. Mercola that "no additional collateral would be needed because the fixed 3% returns generated by the policies would be sufficient to cover the fixed 3% interest rate on the loans." Nonetheless, additional cash collateral was required for the premium financed life insurance arrangement. According to the complaint, "Dr. Mercola never would have participated in the premium financed life insurance arrangement had he known the true policy costs and the true collateral requirements." Therefore the Premium Payment Guaranty Exclusion bars coverage for the Mercola Claim.

### C.   Other Coverage Issues

Based on the threshold bars to coverage for the Mercola Claim, Columbia has not undertaken an exhaustive analysis of other coverage issues at this time. Nonetheless, based on the information that currently is available, Columbia has asked us to alert Abdou to the following additional Policy provisions that may be implicated. Columbia reserves its rights generally and based on each of these provisions:

#### 1.   "Professional Services" Requirement

Insuring Agreement I.A. in the Policy provides that:

> … the Insurer shall pay on behalf of the **Insureds** that **Loss** which the Insureds become legally obligated to pay resulting from a **Claim** for a **Wrongful Act** solely in rendering or failing to render **Professional Services**[.]

Policy, Section I.A. **"Professional Services"** means "with respect to a natural person **Agent** or **General Agent**, to the extent they are provided in the course and scope of the **Insured's** business as an **Agent** or **General Agent** and such **Agent** or **General Agent** has the appropriate license in both the **Client's** resident state or jurisdiction and the state or jurisdiction in which the business is conducted." Policy, Section III.

The complaint alleges that Abdou conducted business with Dr. Mercola both by phone and in at least one meeting at Dr. Mercola's office. To the extent that Abdou conducted business in a state or jurisdiction in which Abdou does not

Exhibit C
Page 74



Joseph M. Aliberti, Esq.
November 24, 2014
Page 7

have an appropriate license, those actions would not qualify as "**Professional Services**" as defined in the Policy. Columbia reserves the right to deny coverage to the extent that Abdou's actions do not qualify as "**Professional Services**" and thus do not implicate the Insuring Agreement in the Policy.

### 2.      Definition of Loss

As noted above, Insuring Agreement I.A. provides that "the Insurer shall pay on behalf of the **Insureds** that **Loss** which the **Insureds** become legally obligated to pay resulting from a **Claim** for a **Wrongful Act** solely in rendering or failing to render **Professional Services**." However, Section III. of the Policy, states that "**Loss**" does not include "punitive damages or return of commissions, fees or charges for services rendered by an **Insured**." Columbia reserves its rights to the extent that the Mercola Plaintiffs' demands for punitive damages and return of commissions and/or fees do not qualify as "**Loss**" within the meaning of the Policy.

### 3.      Definition of Wrongful Act

In addition, Section III. of the Policy defines "**Wrongful Act**" as limited to "any negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**." The complaint alleges that Abdou's acts were intentionally deceptive and fraudulent. Columbia reserves its rights to the extent that the Mercola Claim does not allege a "**Wrongful Act**" and thus does not implicate the Policy's Insuring Agreement.

### 4.      Fees and Commissions Exclusion

The Mercola Claim also may be barred from coverage by the Policy's Fees and Commissions Exclusion. The Policy states, in relevant part, that:

> The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:
>
> …
>
> based upon, directly or indirectly arising out of, or in any way involving:

Exhibit C
Page 75



Joseph M. Aliberti, Esq.
November 24, 2014
Page 8

…

    2. a dispute over fees, commissions or charges,
including without limitation the structure of fees
or excessive fees; however, this paragraph 2. shall
not apply to surrender charges[.]

Policy, Section XIX, Exclusion H.2. (the "Fees and Commissions Exclusion").

The complaint alleges that "there was no reason for the exorbitant amount of life
insurance Abdou recommended, other than that it was the maximum amount of
coverage that Minnesota life [sic] would offer Dr. Mercola, it had the highest
possible premium, and thus, it maximized the commissions that Abdou would
receive." Columbia therefore reserves its rights to the extent that the Fees and
Commissions Exclusion bars coverage for the Mercola Claim.

    5.    **Personal Profit Exclusion**

The Mercola Claim also may be barred from coverage by the Policy's Personal
Profit Exclusion. The Policy states, in relevant part, that:

    The Insurer shall not be liable to pay any **Loss** in
connection with any **Claim**:

    …

    based upon, directly or indirectly arising out of, or
in any way involving:

    …

    2. any actual or alleged profit, remuneration or
pecuniary advantage gained by an **Insured**, to
which the **Insured** was not legally entitled;

    As determined by a final adjudication in the
underlying action or in a separate action or
proceeding.

Exhibit C
Page 76



Joseph M. Aliberti, Esq.
November 24, 2014
Page 9

Policy, Section XIX, Exclusion I.2. (the "Personal Profit Exclusion"). The Mercola Plaintiffs allege that Abdou obtained commissions and/or fees as a result of the premium financed life insurance arrangement that Dr. Mercola would not have purchased if he had known the truth about the arrangement. Although the application of the Personal Profit Exclusion cannot be determined until there is a final adjudication in the Mercola Claim or separate proceeding, Columbia reserves its rights to assert that the Personal Profit Exclusion bars or limits coverage under the Policy for the Mercola Claim.

### 6.    Intentional Acts Exclusion

The Mercola Claim also may be barred from coverage by the Policy's Intentional Acts Exclusion. The Policy states, in relevant part, that:

> The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:
>
> …
>
> based upon, directly or indirectly arising out of, or in any way involving any actual dishonest, deliberately fraudulent, criminal, malicious, purposeful or intentional act, error or omission, or any actual willful violation of any statute or law as determined by a final adjudication in the underlying action or in a separate action or proceeding; however, the **Wrongful Act** of any **Insured** individual shall not be imputed to any other **Insured** individual; and only the **Wrongful Act** of any executive officer shall be imputed to an **Insured** entity;
>
> If the allegations above are subsequently proven true the **Insured** shall reimburse the Insurer for all **Defense Costs** incurred by the Insurer[.]

Policy, Section XIX, Exclusion I.2. (the "Intentional Acts Exclusion"). Furthermore, California Insurance Code Section 533 provides that "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not

Exhibit C
Page 77



Joseph M. Aliberti, Esq.
November 24, 2014
Page 10

exonerated by the negligence of the insured, or of the insured's agents or others."

The Mercola Plaintiffs allege that Abdou's conduct was "deliberately deceptive" and fraudulent. Although the application of the Intentional Acts Exclusion cannot be determined until there is a final adjudication in the Mercola Claim or separate proceeding, Columbia reserves its rights to assert that the Intentional Acts Exclusion bars or limits coverage under the Policy for the Mercola Claim. Columbia further reserves the right to deny coverage to the extent that coverage is barred pursuant to California Insurance Code Section 533.

### 7.    Other Insurance

Section IX. in the Policy is an "Other Insurance" provision, which states that:

> If any **Loss** resulting from any **Claim** is insured under any other policies, this Policy shall apply only to the extent the **Loss** exceeds the Limit of Liability under such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy.

Because the Mercola Claim alleges that at all times relevant to the complaint Abdou was an employee of Koenig, it is possible that other insurance, including any policy(ies) issued to or for the benefit of Koenig, may afford coverage for this matter. Columbia reserves its right to assert that the Policy is excess of any other insurance that may apply to this matter.

### III.    CONCLUSION

For the reasons discussed above, Columbia has concluded that there are two separate and independent bars to coverage under the Policy for the Mercola Claim. Columbia continues to reserve all of its rights under the Policy and applicable law. If the insured has any questions or comments concerning the issues discussed in this letter, or any other aspect of this matter, please feel free to contact us.

Exhibit C
Page 78



Joseph M. Aliberti, Esq.
November 24, 2014
Page 11

Please be advised that if an insured believes an insurer has wrongfully denied coverage, the insured may have the matter reviewed by the California Department of Insurance, Consumer Services Division, Claims Services Bureau, 300 South Spring Street, Los Angeles, California 90013, telephone number (800) 927-4357 (in-state), (213) 897-8921.  Of course, we would ask that you contact us directly as an initial matter.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Mary E. Borja

cc:  Todd Arno (via email)

Exhibit C
Page 79

EXHIBIT "D"



1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Mary E. Borja
202.719.4252
mborja@wileyrein.com

December 3, 2014

**VIA ELECTRONIC MAIL**

Joseph M. Aliberti, Esq.
Law Offices Joseph M. Aliberti
260 Newport Center Drive, Suite 100,
Newport Beach, Ca. 92660

| | | |
|---|---|---|
| Re: | Insured: | **The Financial Sales Professionals Purchasing Group** |
| | Policy No.: | **425391280** |
| | Policy Period: | **July 1, 2014 – July 1, 2015** |
| | Claimants: | **Joseph Mercola, D.O., Janet Selvig, Mercola.com Health Resources, LLC** |
| | File. No. | **IAA01415** |

Dear Mr. Aliberti:

This is to respond to your inquiry whether Columbia Casualty Company ("Columbia") will provide a defense for Mr. Mostafa Abdou ("Abdou") in the above-referenced matter pending resolution of the coverage issues addressed in our November 24, 2014 letter. This is to confirm that, notwithstanding the significant coverage issues discussed in our November 24 letter, Columbia will provide a defense to Abdou for the claim by Dr. Mercola, subject to a complete reservation of rights, including the right to withdraw from the defense and/or to seek the reimbursement of defense costs paid by Columbia, consistent with *Buss v. Superior Court*, 939 P.2d 766 (Cal. 1997). Columbia intends to file a declaratory judgment action to seek judicial resolution of the coverage issues. In light of the coverage issues and Columbia's reservation of rights, Abdou is entitled to select independent defense counsel ("Cumis" counsel) pursuant to Cal. Civil Code § 2860. Columbia agrees that David Carlson and you may act as Cumis counsel for Abdou for the purpose of filing a motion to change venue. Columbia will revisit the use of two firms once the motion to change venue is decided.

The views expressed in this letter are based on the information submitted to Columbia to date. Columbia reserves the right to raise all applicable terms and conditions of the Policy, and applicable law as defenses to coverage as



Joseph M. Aliberti, Esq.
December 3, 2014
Page 2

appropriate as its review of this matter continues or as additional information becomes available to it.

If the insured has any questions or comments concerning the issues discussed in this letter, or any other aspect of this matter, please feel free to contact us.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Mary E. Borja

cc:  Todd Arno (via email)

EXHIBIT "E"

1  Sean D. Schwerdtfeger, Esq. (SBN 179521)
   Justin J. Wieland, Esq. (SBN 255619)
2  **SCHWERDTFEGER LAW GROUP**
   501 West Broadway, Suite 1700
3  San Diego, CA 92101
   Tel. (619) 595-3403
4  Fax. (619) 595-3404
   sds@sdsattorneys.com
5

6  Attorneys for Plaintiff,
   COLUMBIA CASUALTY COMPANY
7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  COLUMBIA CASUALTY COMPANY,        **CASE NO.**  **'15CV0080 LAB KSC**

             Plaintiff,
12
                                      **COMPLAINT FOR DECLARATORY**
13      vs.                           **JUDGMENT**

14  MOSTAFA ABDOU,

15             Defendant

16
        Plaintiff Columbia Casualty Company ("Columbia"), for its Complaint for Declaratory
17
    Judgment, alleges on knowledge, information and belief as follows:
18
                           **NATURE OF THE ACTION**
19
        1.      Columbia brings this action to obtain a judicial determination and declaration as to
20
    the parties' rights and obligations with respect to an insurance policy issued by Columbia under
21
    which Defendant Mostafa Abdou ("Abdou") has sought coverage for a claim made against him.
22
        2.      An actual, ripe, and justiciable controversy has arisen and now exists relating to
23
    the parties' respective rights, duties and obligations under the policy.
24
                                 **PARTIES**
25
        3.      Columbia is an Illinois corporation with its principal place of business in Chicago,
26
    Illinois.  Columbia legally transacts insurance business in the State of California and within the
27
    geographical jurisdiction of this Court.
28
        4.      Abdou is a citizen of California residing in San Diego, California.

                                       1
                                  **COMPLAINT**
                                              **CASE NO.**

4. Abdou is a citizen of California residing in San Diego, California.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The Defendant resides in this District, and a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### The Underlying Action

7. Abdou's client, Dr. Joseph Mercola ("Mercola"), filed a lawsuit styled *Mercola, et al. v. Abdou, et al.*, No. 1:14-DV-8170 (N.D. Ill.) (the "Underlying Action"), alleging that he lost more than $3,000,000 as a result of a premium financed life insurance arrangement that Abdou brokered on his behalf. A true and correct copy of the complaint in the Underlying Action is attached as Exhibit 1.

8. The complaint in the Underlying Action includes counts against Abdou for breach of fiduciary duty, fraud, and consumer fraud.

9. The Underlying Action seeks no less than $3,000,000 in compensatory damages, disgorgement of all commissions earned in connection with the sale of the premium financed life insurance policies, punitive damages, attorney's fees and costs.

### Insurance Policy

10. Columbia issued Life Agent Professional Liability Policy No. 425391280 to The Financial Sales Professionals Purchasing Group for the policy period of July 1, 2014 to July 1, 2015 (the "Policy"). A true and correct copy of the Policy except for the application is attached as Exhibit 2.

11. The Policy contains an exclusion which states, in relevant part, that:

> The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:
>
> …

2

COMPLAINT

CASE NO.

based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, attempted sale or servicing of any:

…

13.  [ ] life insurance policy in which the premium was paid for, in whole or in part, by or through any premium finance mechanism or any premium finance company.

Policy, Section XIX, Exclusion L.13. (the "Premium Finance Exclusion").

12.  The Policy also contains an exclusion that states, in relevant part, that:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

…

based upon, directly or indirectly arising out of, or in any way involving [the]:

…

2.  making or stating of any promises or guarantees as to interest rates or fluctuations in interest rates, the market value of any investment or insurance product, or future premium payments[.]

Policy, Section XIX, Exclusion F.2. (the "Premium Payment Guaranty Exclusion").

13.  Columbia has told Abdou that there is no coverage for the Underlying Action based on the Premium Finance Exclusion and the Premium Payment Guaranty Exclusion. Columbia also has reserved its rights based on other Policy terms, including the definition of "professional services"; the definition of "loss"; the definition of "wrongful act"; the exclusion for disputes over fees, commissions or charges; the personal profit exclusion; the intentional acts exclusion; and the provision concerning other insurance. Columbia is providing a defense for Abdou in the Underlying Action, subject to a full and complete reservation of rights.

14.  Nothing in this Complaint should be construed as a waiver by Columbia of any other coverage defenses under the Policy, and Columbia reserves the right to raise all other Policy terms and conditions as defenses to coverage as may be appropriate.

///

///

///

**COMPLAINT**

**CASE NO.**

Exhibit E
Page 86

**COUNT I**

**(Declaratory Judgment As To Application of the Premium Finance Exclusion)**

15.     Columbia incorporates by reference each of the allegations of paragraphs 1 through 14 of this Complaint.

16.     The complaint in the Underlying Action unequivocally states that "[t]his action arises from a complex insurance sales scheme known in the insurance industry as 'premium financed life insurance.'"  Moreover, a review of the complaint in the Underlying Action confirms that the action focuses at its very core on alleged wrongful acts in connection with premium financed life insurance.

17.     The Underlying Action thus is a claim that is "based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, attempted sale or servicing of any: … life insurance policy in which the premium was paid for, in whole or in part, by or through any premium finance mechanism."

18.     Accordingly, Columbia requests that the Court declare that coverage for the Underlying Action is barred by the Premium Finance Exclusion.

**COUNT II**

**(Declaratory Judgment As To Application of the**

**Premium Payment Guaranty Exclusion)**

19.     Columbia incorporates by reference each of the allegations of paragraphs 1 through 14 of this Complaint.

20.     The complaint in the Underlying Action alleges that Abdou informed Mercola that Mercola would not be required to spend money out of pocket to support the loan for the policy premium and that he would not have to pledge additional collateral for the premium financing (other than an initial deposit and the policies themselves).  The complaint in the Underlying Action also alleges that Abdou assured Mercola that no additional collateral would be needed because the returns generated by the policies would cover the interest on the premium loans. Nonetheless, additional cash collateral was required from Mercola for the premium financed life insurance arrangement.  Mercola asserts in the complaint in the Underlying Action that he "never

4

**COMPLAINT**

**CASE NO.**

1 would have participated in the premium financed life insurance arrangement had he known the

2 true policy costs and the true collateral requirements."

3      21.    The Underlying Action is thus a claim that is "based upon, directly or indirectly

4 arising out of, or in any way involving [the] … making or stating of any promises or guarantees

5 as to … future premium payments."

6      22.    Accordingly, Columbia requests that the Court declare that coverage for the

7 Underlying Action is barred by the Premium Payment Guaranty Exclusion.

8 WHEREFORE, Columbia respectfully requests that this Court enter judgment as follows:

9      Declare that the Premium Finance Exclusion bars coverage for the Underlying Action;

10      Declare that the Premium Payment Guaranty Exclusion bars coverage for the Underlying

11 Action; and

12      Award Columbia such additional declaratory and other relief as the Court finds

13 appropriate.

14

15 Dated: January  , 2015            By:_____

16

17 Of Counsel:                   Sean D. Schwerdtfeger
Richard A. Simpson              SCHWERDTFEGER LAW GROUP
18 Mary E. Borja                  501 West Broadway, Suite 1700
WILEY REIN LLP              San Diego, CA 92101
19 1776 K Street, NW             (619) 595-3403
Washington, DC  20006         (619) 595-3404 (facsimile)
20 (202) 719-7000               sds@sdsattorneys.com
(202) 719-7049 (facsimile)      Attorneys for Plaintiff COLUMBIA
21 rsimpson@wileyrein.com         CASUALTY COMPANY
mborja@wileyrein.com
22

23

24

25

26

27

28

**COMPLAINT**

CASE NO.